26 N.J. Super. 90 (1953)
97 A.2d 419
GERTRUDE L. BOERGER, PLAINTIFF,
v.
HARRY E. BOERGER, JR., DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided May 15, 1953.
*91 Mr. Charles M. Grosman, attorney for plaintiff.
Mr. Thomas J. Holleran, attorney for defendant.
*92 GOLDMANN, J.S.C.
The issue presented for determination is the future religious training and upbringing of the two children of the parties, now divorced. A review of past events will provide the setting for the present controversy.
Plaintiff was baptized in the Zion Evangelical and Reformed Church, a Newark, N.J. Lutheran congregation, in 1918 and went to Sunday School and services there until she was 10 or 11. When her family moved she attended Lutheran services irregularly in Highlands, N.J., and in the Bronx, New York City. Her religious activities during her `teen years were admittedly "sketchy." She met defendant, an observant Catholic, in December 1938. They began to keep company regularly in 1939. Inevitably, the question of their different religions arose, and the subject was thoroughly discussed. Plaintiff ultimately concluded that she wanted to become a Catholic. She came to this decision of her own free will, with full understanding of what that step meant, and without the intervention of a priest. She agreed that she wanted to be instructed in the faith, to be baptized, confirmed and married in the Roman Catholic rite, and to raise any children of the marriage as Catholics.
Plaintiff entered upon a course of Catholic instruction by a priest in October 1939, the arrangements being made by a girl friend with whom she had been going to mass on Sundays. She was baptized in February 1940 and confirmed in the Roman Catholic rite in June of that year, one month after she and defendant became formally engaged. The marriage, a nuptial mass, took place November 8, 1941. A first daughter, Dianne Lee, was born two years later and plaintiff herself prepared the child for baptism in the Catholic church. Defendant was in the armed services from 1941 to November 1945. A second daughter, Geraldine Carol, was born in September 1946, and was baptized on January 12 following, with plaintiff's full consent.
In July 1949 plaintiff filed her complaint for divorce on the ground of defendant's adultery with a named co-respondent during the preceding month. Defendant counterclaimed for divorce a vinculo, charging desertion on or about March *93 19, 1947. Plaintiff did not attend the divorce hearing. The judgment nisi, advised December 1, 1949, dismissed the complaint on plaintiff's own motion "for lack of proof" and granted defendant a divorce on his counterclaim. The award of custody of the children to plaintiff was unopposed, the right of reasonable visitation being reserved to defendant who was directed to pay $20 a week for their support. Judgment final was entered March 2, 1950.
Meanwhile, plaintiff applied for an order fixing the visitation rights of the father and increasing the support allowance. A consent order was entered March 16, 1951; it gave defendant the right of custody each Sunday from 11 A.M. to 8 P.M., as well as for one month during the summer and on alternating holidays during the year. The support allowance was increased, without opposition, to $27 a week. Neither this order nor the judgment nisi referred to the character of the religious upbringing the children were to receive.
In May 1951 plaintiff applied for an order restraining defendant from interfering with the religious training of the children. Her petition recites, among other things, that she had with defendant's knowledge resumed the Protestant faith and was attending the Zion Evangelical and Reformed Church in Newark; that her daughters had been attending Sunday School and services there since the divorce; that although defendant knew of this as well as of plaintiff's wish that the children not be brought up in another religion, he was nevertheless taking them to Catholic church; and that the children did not want to attend Catholic services and were "confused and upset."
Defendant, in turn, applied for an order specifying the religion in which the children were to be instructed and reared. His petition alleges that he first learned of plaintiff's intention not to stand by the ante-nuptial agreement and raise the children as Catholics in February 1951 when the parties were negotiating the terms of the order fixing the right of visitation. The petition further recites the details of the courtship and ante-nuptial agreement, the marriage, *94 divorce and custodial arrangement. Defendant alleges that the marital differences arose after his return from service when he learned that his wife had become dissatisfied with the limitations and lack of freedom of married life, and that she found the requirements of his religion too demanding and rigorous, albeit she still continued to respect her premarital promise to raise the children in the Church. He charges that she was influenced in this attitude by her mother, who was anti-Catholic. Defendant asks for an order determining that his daughters be reared in the Roman Catholic Church.
The only witnesses were the minister of the Zion Evangelical and Reformed Church and plaintiff. Defendant stipulated that the facts relating to plaintiff's early Lutheran background, the courtship, ante-nuptial agreement, engagement, marriage and court proceedings were as has here been stated; that plaintiff had resumed the Lutheran religion, leading the children back into the Protestant Church with her, and that he had been taking the children to his church on Sundays after their Lutheran Sunday School session.
Plaintiff testified that she separated from defendant because he associated with other women. Her decision not to continue in the Catholic faith was reached a month after the birth of her second child on September 22, 1946; she "lost all faith" and did not consider it right that "a man should get away with things like that and still be a devoted Catholic." Nonetheless, she had Geraldine baptized in January 1947, entered Dianne in parochial school in September 1948, and took her to Sunday Mass until January 1950.
Plaintiff rejoined the Lutheran fold in January 1950  soon after defendant obtained his judgment nisi  by "renewal of profession of faith." The children cannot become members of the church until they reach 12, and then only by confirmation.
Plaintiff and the children lived under the same roof with defendant until May 1950, when the house was sold. They now live with her mother and stepfather in Maplewood, N.J. Dianne is over nine years old and in the third grade of the *95 local public school, where she was enrolled in September 1950. Geraldine, now almost seven, attends kindergarten there.
Plaintiff contends that having been entrusted with the custody of her two daughters she has the right to bring them up in the church which she attends. Defendant argues that their religious training should, in the exercise of sound judicial discretion, be continued in the Roman Catholic rite, and this because (1) plaintiff unconscionably seeks to change their religious education, and (2) she has lost her right to determine their training by reason of "estoppel, waiver and abandonment."
The resolution of the instant controversy cannot, of course, stem from any disposition on the part of the court to favor one body of religious thought and practice over another. No such disposition exists. In this State "all Christian denominations stand on the same footing in the eye of the law." In re Turner, 19 N.J. Eq. 433, 435 (Prerog. 1868). The nature of the religions here involved and the doctrines they teach are matters irrelevant to the present inquiry.
American courts have been remarkably free from litigation over the religious education of children. Decisions are few and relatively recent. Three lines of approach to the problem may be discerned.
The early English cases established the proposition that, except in special circumstances, the father's wishes governed the religious education his child was to receive. If he had failed to express such a wish, it was presumed that he would have desired the child to be raised in his religion, although he himself might have neglected to practice it. Friedman, "The Parental Right to Control the Religious Education of a Child," 29 Harv. L. Rev. 485, 488-491 (1916). The rule was enforced even when the result was "to create a barrier between a widowed mother and her only child; to annul the mother's influence over her daughter on the most important of all subjects; * * *." Hawksworth v. Hawksworth, L.R. 6 Ch. 539, 540 (1871). This doctrine received relatively *96 little support in the United States (cf. Hernandez v. Thomas, 50 Fla. 522, 39 So. 641 (Sup. Ct. 1905)); it was critically examined by our former Court of Chancery in In re Flynn, 87 N.J. Eq. 413, 418-421 (Ch. 1917). England has by statute abolished the superior right of the father (Guardianship of Infants Act (1925), 15 & 16 Geo. V, c. 45), and with it the convenient but harsh formulary of religio sequitur patrem.
It may be observed that defendant does not seek to establish his right on the basis of that doctrine, nor could he. In New Jersey, as generally throughout the nation, the rights of both parents are, in the absence of misconduct, held to be equal as regards the care, nurture, education and welfare of the children of the marriage. R.S. 9:2-4.
A second line of authority holds that the question of a child's religious education is an internal affair of the home  and there the courts will not venture. Such was the view of New York's highest court in People ex rel. Sisson v. Sisson, 271 N.Y. 285, 2 N.E.2d 660, 661 (Ct. App. 1936), where a disagreement arose between the parents over the education of their child and the court said:
"Dispute between parents when it does not involve anything immoral or harmful to the welfare of the child is beyond the reach of the law. The vast majority of matters concerning the upbringing of children must be left to the conscience, patience, and self-restraint of father and mother. No end of difficulties would arise should judges try to tell parents how to bring up their children. * * *"
In Ex parte Kananack, 272 App. Div. 783, 69 N.Y.S.2d 889 (App. Div. 1947), the court held it would not take the question of the child's religious training into its own hands, short of circumstances amounting to unfitness on the part of the custodian. The reluctance of courts to inject themselves into so personal and controversial an area is understandable. Cf. Donahue v. Donahue, 142 N.J. Eq. 701, 703-4 (E. & A. 1948); In re Flynn, 87 N.J. Eq. 413, 423 (Ch. 1917). And see 2 Nelson, Divorce and Annulment (2d ed. 1945), § 15.13, p. 183.
*97 There is a third view, which may be considered the middle-of-the-road position, where courts consider the question of religious education from the standpoint of what is best for the welfare of the child. 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th ed. 1921), § 776, p. 849. In Purinton v. Jamrock, 195 Mass. 187, 199-200, 80 N.E. 802, 805 (Sup. Jud. Ct. 1907), the highest court of Massachusetts, in dealing with a custody dispute between the mother of an illegitimate child and the family which adopted it, the parties being of different religious beliefs, said:
"* * * But in such a case as this it is not the rights of the parent that are chiefly to be considered. The first and paramount duty is to consult the welfare of the child. The wishes of the parent as to the religious education and surroundings of the child are entitled to weight; if there is nothing to put in the balance against them, ordinarily they will be decisive. If, however, those wishes cannot be carried into effect without sacrificing what the court sees to be for the welfare of the child, they must so far be disregarded. The court will not itself prefer one church to another, but will act without bias for the welfare of the child under the circumstances of each case. This is the fair consensus of judicial opinion, although a difference of circumstances has caused the use of different expressions and the reaching of different results in the different cases. * * *"
There appears to be no decision in New Jersey squarely passing upon the issue presented by the circumstances of this case. In In re Turner, 19 N.J. Eq. 433 (Prerog. 1868), the father was Protestant, the mother Catholic. They had agreed that their child be raised a Catholic. The father died intestate, without disposing of the guardianship of the child. The mother by her will directed the child be educated in a Roman Catholic convent, and that her father and sisters be its guardians. The court awarded guardianship to the maternal grandfather as against the claim of the paternal grandfather. Though the mother had no power to dispose of the guardianship, the court held that her wishes and convictions, rather than those of the judge, should control. The court observed that the result might be otherwise if it clearly *98 appeared that the interest of the infant required that the mother's wishes be disregarded.
In re Flynn, 87 N.J. Eq. 413 (Ch. 1917), a habeas corpus proceeding invoking the parens patriae jurisdiction of Chancery over infants, involved a custody dispute between a Lutheran stepmother and a Catholic paternal aunt. The child had been raised a Catholic by his father and natural mother, who were of that religion. The father died without appointing a guardian, and the stepmother continued to rear the boy as a Catholic. The aunt and uncle had clandestinely carried him off. The court found they had no right to his custody as against the stepmother who stood in loco parentis  a position in which the father of the boy had placed her. Vice-Chancellor Stevenson held it was unnecessary to deal with the problem of the respective rights of a father and mother to direct the religious education of their child where they were of different faiths, or had conflicting plans, because the parents of the Flynn boy had both been Roman Catholics and had united in having him baptized and educated in their faith. The court questioned its power to award custody in a habeas corpus proceeding brought under the parens patriae jurisdiction and then to make an order directing in what religious faith the child must be reared. It found that the stepmother was, in fact, discharging her moral duty of continuing the religious education of the child in the faith of the parents.
The case most nearly approaching ours is Donahue v. Donahue, 142 N.J. Eq. 701 (E. & A. 1948). Both parents sought custody of their two children. The father was a Catholic, the mother a Jewess. They were married in a Lutheran church. The father embraced Christian Science; he enrolled his son in a Christian Science Sunday School, and later he had his daughter baptized a Catholic without the wife's consent. Custody was awarded to the mother. At the final hearing the father had complained that the children were receiving no religious education. The mother thereupon enrolled them for training in the Jewish faith. The father then sought an order directing that the boy be *99 reared in Christian Science and the girl in Catholicism. Chancery declined to interfere. The Court of Errors and Appeals unanimously affirmed. It remarked on the "haphazard religious setting" of the case and, after referring to R.S. 9:2-4 which grants parents equal rights in the education of their children, found nothing in the record to justify judicial interference with the mother's decision. The court said:
"Under what circumstances, if any, a court would be justified in intervening with respect to the religious training selected by a parent having custody need not here be considered. No end of difficulties would arise if judges sought to proscribe the selection of a religious faith made by a parent having custody. People ex rel. Sisson v. Sisson, 271 N.Y. 285, 287, 288, 2 N.E.2d 660, 661 (1936). Intervention in matters of religion is a perilous adventure upon which the judiciary should be loathe to embark." (142 N.J. Eq. at pages 703-704)
See, generally, 10 New Jersey Practice (Herr, Marriage, Divorce and Separation) (1950), § 583, p. 632.
Analysis of the few New Jersey cases that have considered the matter reveals that religion may be a factor to be weighed in awarding custody  though not always the controlling element (10 New Jersey Practice, § 569, p. 610; English v. English, 27 N.J. Eq. 71, 75 (Ch. 1876), reversed on other grounds, 27 N.J. Eq. 579 (E. & A. 1876)); but once custody is granted, the courts are loath to interfere with the religious upbringing sanctioned by the custodian. No clearly defined doctrine has emerged that would be helpful in cases like the one before us.
It would seem that the basic principle to follow is one well established in our jurisprudence: the court should always act in accordance with what is best for the happiness and welfare of the child. Such is the primary consideration in custody actions, which present highly analogous problems. R.S. 9:2-4; 10 New Jersey Practice, § 512, p. 524, and § 569, p. 610. As was said by our Supreme Court in the recent case of Lavigne v. Family and Children's Society of Elizabeth, 11 N.J. 473, 479 (1953):
*100 "It has long been the settled law in the court of last resort in this State that in dealing with the custody and upbringing of an infant the welfare of the child is the controlling consideration, even going to the extent of consulting the wishes of the child if of proper age * * *."
This view represents the great weight of authority in the United States and England. Cf. Cory v. Cory, 70 Cal. App.2d 563, 161 P.2d 385, 392 (D. Ct. App. 1945); Parks v. Cook, 180 S.W. 2d 64 (Mo. Ct. App. 1944); 49 Harv. L. Rev. 831 (1936); 36 Col. L. Rev. 678 (1936). It permits the court to exercise its discretion in a manner that will meet the circumstances of each case. This approaches justice much more closely than do rigid doctrines under which the court either directs the child to be raised in its father's religion (the former English rule) or finds that it cannot deal with the problem at all (the Sisson doctrine).
Defendant stresses the binding force of the ante-nuptial agreement. What effect should such an agreement have in applying the principle that the court's action is to be governed by the best interests of the child? In one view
"* * * No mere agreement as to the religious education of children between father and mother before or after marriage is binding and it is always open to either parent to change his mind, as it is his privilege to inculcate upon his children those religious principles which for the time being seem to him best. Some decisions base this fundamental principle on a public policy that a parent in the interest of morality should not be held to bind himself conclusively to relinquish control over his children's religious education. Especially must this appeal to those who regard this right as vested in the parents solely for the benefit of their children. Other authorities, however, rest these decisions rather on the practical conditions arising out of ordinary family life.

* * * * * * * *
It is further pointed out that for breach of a contract of a parent concerning the religious education of a child no damages can be recovered and it cannot be enforced by a suit for specific performance." Friedman, "The Parental Right to Control the Religious Education of a Child," 29 Harv. L. Rev. 485, 492 (1916).
The opposite position was taken by a lower New York court in Ramon v. Ramon, 34 N.Y.S.2d 100 (N.Y.C. Dom. Rel. Ct. 1942), which enforced the ante-nuptial agreement and *101 did not consider the question of the child's welfare. That case was cited by the New York Supreme Court in Shearer v. Shearer, 73 N.Y.S.2d 337, 358 (1947), but the court made its position clear when it said that it was "charged with a responsibility even more impelling than the religious rights of this father. The controlling consideration here is the welfare of the children." The court then determined that their welfare would best be served by enforcing the agreement. Cf. In re Turner, 19 N.J. Eq. 433 (Prerog. 1868), and see 39 Am. Jur., Parent and Child, § 50, p. 684.
To invoke the principle of estoppel against the plaintiff because of her ante-nuptial agreement, as defendant urges, would be to disregard the overriding consideration of what is best for the children and to determine  arbitrarily  their future welfare by an act with which they had nothing to do. In addition, it would deprive the mother of her right to change her mind  to choose a religion which apparently gives her greater spiritual comfort  and to inculcate in the children entrusted to her custody the religious principles which, for the time being, seem to her best. For like reasons, the court will not adopt defendant's contention that there has been an abandonment or waiver by plaintiff of her right, as custodian, to give other than Catholic training to her daughters.
Defendant argues that plaintiff has acted unconscionably, and so may not now insist upon her own choice of religious training. After the birth of the second child in the fall of 1946 she had privately concluded that she could not continue in the Catholic church. Her reasons were personal, and her decision influenced by what she considered her husband's improper moral conduct. Her mother probably had something to do with that decision; she was then living with plaintiff, had opposed the marriage and, in fact, not attended the church ceremony, and had herself had an unhappy experience when she was divorced from her first husband, a Catholic. However, plaintiff's final decision was entirely her own and her conviction a sincere one. She kept her daughters in their father's faith until he obtained his *102 absolute divorce, and then took them into the Lutheran Church. Plaintiff did not press her own divorce action, nor defend against her husband's counterclaim. No question as to religion or religious training was raised when custody was awarded, although, as appears from defendant's affidavit in opposition to plaintiff's present application and from his own petition, when he returned from service late in 1945 he learned from her that she had not attended church regularly during his absence, that her interest in Catholicism had waned, and that she considered the religion "too demanding and rigorous." Further, it is to be recalled that the parties lived in the same house until May 1950. Plaintiff had brought her action for absolute divorce in June 1949. She had not re-enrolled her older daughter in parochial school in September 1949. She went back into the Lutheran Church, with her children, in January 1950, two months before entry of final judgment. Nor was the question of religious training raised when defendant's visitation rights were more definitely fixed in March 1951, at which time he certainly knew that both plaintiff and the children were attending a Lutheran church. Under all the circumstances, plaintiff's conduct will not be deemed unconscionable. Here, too, the principle of what is best for the children has a superior standing.
The Catholic training of the children never progressed so far that definite religious ideas were impressed upon their minds to such an extent that any change would unsettle their tranquillity and disturb their mental poise. The older daughter was only five when she entered parochial school. She left at six and was transferred to public school where she has since remained. Any attendance at Catholic services ended when she was six years old. The younger child never went to parochial school, and any church attendance occurred before she reached the age of four.
The court privately examined Dianne, now going on ten, in chambers with the consent of counsel, and reported the interview to them in writing. Such practice is well established. The object of such an examination is to determine, *103 if possible, the predilection of the child. Such predilection, when ascertained, is a factor that will be considered by the trial court. The preference of a young child has a place in the determination, but not a conclusive place. Callen v. Gill, 7 N.J. 312, 319 (1951). The limitations of such an interview are almost self-evident, as are its dangers, among them that of influenced judgment. Cf. Hawksworth v. Hawksworth, L.R. 6 Ch. 539, 540-1 (1871), and see Friedman, op. cit., 29 Harv. L. Rev. 485, 493-494 (1916). Age and the capacity to form a rational judgment are the important considerations. Richards v. Collins, 45 N.J. Eq. 283, 287 (E. & A. 1889); Weinman. "The Trial Judge Awards Custody," 10 Law and Contemporary Problems, 721, 729 (1944).
As reported to counsel, Dianne is a bright girl, far above average in intelligence and insight. She discussed her home life, parents, and particularly Sunday School and church. She appears to have been little influenced against going to church with her father, or against the Church itself, although the mother did at one time object to her being taught catechism. Dianne is happy in Sunday School, likes her teacher and enjoys the company of her young friends. She says that she does not understand the language of her father's church and has no opportunity to sing there. She feels she should not have to go to church with her father after Sunday School, but should be allowed to play, as do her girl friends. She remembers parochial school; she liked the sisters there but they were strict. She "loves" public school and her teacher, but recognizes that the work there is necessarily different from what she did in parochial kindergarten. She loves her father, but didn't think it was nice of him to make her learn answers to questions (catechism) when she could have been playing. She prefers to go to Sunday School and her mother's church.
Obviously, the child cannot, because of her immaturity, have any real capacity for forming an intelligent opinion on so complex a subject as the relative content and values of Lutheranism and Catholicism. Her reaction is to externalities. *104 The most that can be said is that she is happier when she is in her mother's church, and that she finds her experience there personally more meaningful for the time being.
In determining what is for the child's best interest, the court may additionally inquire whether it is psychologically desirable for the child to be exposed to the conflicting desires of its parents insofar as its religious training is concerned. The psychologist would answer in the negative:
"I can't imagine a situation in which it is fair to the child to divide him. Whichever parent he goes with must thoroughly understand his basic need to feel that both parents did the best they could under the circumstances. * * * A very few parents can share the child without trying to divide his loyalties  but the court will do well to make its basic rule that one or the other have custody and control." Plant, "The Psychiatrist Views Children of Divorced Parents," 10 Law and Contemporary Problems 807, 816 (1944).
The view has been expressed that as between father and mother, any question respecting the child's religion should be settled by the custody award. Friedman, op cit., 29 Harv. L. Rev. 485, 499 (1916). There is much to be said for the view that all other things being equal, the determining factor should be custody. There is a suggestion of this in In re Flynn, 87 N.J. Eq. 413 (Ch. 1917). The parent to whom custody is awarded must logically and naturally be the one who lawfully exercises the greater control and influence over the child. The mother, who lives with the child more than six days a week, as contrasted with the father's limited visitation of a few hours on Sunday, is the one who actually rears the child and shapes its moral, mental, emotional and physical nature. To create a basic religious conflict in the mind of the child, and between it and its custodian, would be detrimental to its welfare.
The mother here is, from every appearance and action, a conscientious and devoted follower of Lutheranism. Her desire to give her daughters religious training and upbringing in the church of her choice  the church in which she was baptized and in which she spent her earliest years  is sincerely motivated. We discern nothing in her present *105 application which indicates that her purpose is to harass her former husband or to gain petty personal advantage over him.
In our view, the happiness and welfare of the children will best be served by committing their religious training to their mother, legally designated as their custodian, without interference by the father, until such time as they are of an age to exercise their own discretion in religious matters.
Plaintiff's application is granted, and defendant's denied.