**HACKETT, Plaintiff, v. HACKETT, Jr., Defendant.**

Common Pleas Court, Lucas County.

No. 49584.   Decided November 15, 1957.

Holloway, Peppers & Romanoff, Peter Moran, Toledo, for plaintiff.
William A. Finn, Toledo, for defendant.

**OPINION**

By ALEXANDER, J.

On motion to show cause filed by defendant-father against plaintiff-mother.

The facts are not in dispute.  The mother, a non-Catholic, and the father, a Catholic, were married in the Catholic Church after executing an ante-nuptial agreement providing that "all children born issue of the marriage shall attend the Catholic school and be brought up in the Catholic faith."  One child was born and duly baptized in the Catholic Church.

Soon thereafter the mother changed her mind and sought exit from her ante-nuptial agreement. Release was refused. As she nursed her child she apparently nursed also a determination to repudiate her agreement and by the time the child had reached five she was making no secret of her intentions. A few months later she left the matrimonial dwelling, taking the child with her. She retained counsel and executed a separation agreement which, among other things, awarded the non-Catholic mother custody of the child and provided the child was to attend a certain Catholic school previously approved by the mother.

Thereafter the parties were divorced in this court, without contest, and the separation agreement, though not approved by the Court, was, in compliance with the terms thereof, made a part of the decree.

The mother duly entered the child in the Catholic school where she completed the first grade. When it came time to enter the child in the second grade, instead of taking the child back to the same school, the mother entered her in a public school. Thereupon the father filed this motion, calling upon the court, among other things, to require the mother to show cause why she should not be punished for contempt of court for violating the court order embodying the agreement that the child attend the Catholic school.

The mother appeared and defended on the ground that this provision of both the ante-and post-nuptial contracts is void, and hence that portion of the court order reiterating same is not enforceable by the court. Whether this contention is correct is the only issue before the court at this time.

The father's counsel has argued orally and in briefs with persuasive skill and impressive learning in behalf of the validity of this kind of contract and court order, and very effectively in behalf of his client who happens to be not only an able and popular member of the bar of this court, but also the nephew of the distinguished Roman Catholic prelate who performed his marriage ceremony.

However, we are constrained to hold that the court does not have the right or the power to enforce the contract the mother has repudiated or the order of which she appears to be in contempt, either by imprisoning her until she sends the child back to the Catholic school or by any other means. Our study of the question has convinced us that the violated portion of the contracts and hence the order embracing same are really void. "Void" means "empty, having no legal force, ineffectual, unenforceable." It is not the court's function to pronounce a value judgment upon the contracts, i. e., to decide whether good or evil, right or wrong, wise or unwise, proper or improper.

The **Ohio Constitution, Art. I, Sec. 7** reads as follows:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted. . . ."

The Catholic father very understandably insists upon the child's attendance at the Catholic school because there the child is nurtured in and prepared for the Catholic form of worship. Now it seems a school must have scholars as well as dollars. Hence it must be concluded that when the father pays the child's tuition he supports and maintains the Catholic school and the Catholic faith. And that when the mother sends the child to this school she too supports and maintains the Catholic school and the Catholic faith. Only if the school were to abandon every vestige of Catholicism would these conclusions appear to be untrue.

Regardless of what the mother assented to or solemnly promised, if the court were to **compel** her now, **viet armis** or otherwise, to keep her promise, that would appear to be compelling her to support or maintain a certain "form of worship, against her consent." Moreover, that would be an unpermitted "interference with her rights of conscience." And these are among the very things which no person, not even a devout communicant, may lawfully be **compelled** to do by any person, not even his own church—against his consent.

The Supreme Court of the United States in a celebrated case (McCollum v. Board of Education, 333 U. S. 203, 219, footnote 8), quotes Black, "Essays and Speeches," 52 (1885): "The manifest object of the men who framed the institutions of this country was to have a State without religion and a Church without politics—that is to say, they meant that one should never be used as an engine for the purpose of the other. . . . For that reason they built up a wall of complete and perfect partition between the two." Surely it would be regarded as using the State "as an engine for the purpose of the" Church to call upon the authority and power of the State to coerce the mother to send the child against her consent to any school extolling the tenets of any religion. It would be breaching that "wall of complete and perfect partition" erected for the benefit and protection of the Church as well as of the State.

The father "concedes that the **welfare of the child** is the determining factor." But the court is not deciding the welfare issue at this time, but only the question of the court's power to enforce the contracts and order, which of course depends upon the legal validity thereof. "A child's interest in its temporal welfare will be protected by the law if its parents neglect to protect it; hence, it is appropriate to speak of a child's right to its temporal welfare. On the other hand, under the mandate of separation of church and state, if the child's religious welfare is neglected the state may not intervene to protect it. A judge convinced that a child will die if it does not receive an immediate blood transfusion can constitutionally direct the giving of the transfusion over the parent's objection. A judge equally convinced that the parent's refusal to baptize his dying child will deprive the child of eternal salvation is constitutionally without power to take any legal action. It serves no useful purpose to speak of a legal right which the Constitution prohibits the state from recognizing or enforcing." (Pfeffer, p. 354. See below.)

Just in case we have misconstrued the Constitution, and it be propounded that it doesn't really mean what it says, we have sought enlightenment beyond the properly partisan briefs of counsel in case at

bar, and believe we have found it in three collations of authorities each of which appears to be free from partisanship, bias or prejudice. At least the authors could hardly have been moved by considerations of politics (none was in public life); and certainly none had the immediate responsibility of determining the course of the spiritual salvation of a flesh and blood child; or had before him in person living parents operating powerfully to bend his views one way or the other. These authorities are collected and analyzed in the Harvard Law Review of 1916; the Yale Law Journal of 1941; and the Boston University Law Review of 1955.

The first, in the Harvard Law Review, Vol. 29, p. 485, is a much cited article by Lee M. Friedman, "Religious Education of a Child." On page 492 he is speaking of "rival religious claims between parents or relatives over some poor child who had been made the object of religious zeal." He goes on to say unequivocally: "No mere agreement as to the religious education of children between father and mother before or after marriage is binding and it is always open to either parent to change his mind, as it is his privilege to inculcate upon his children those religious principles which for the time being seem to him best. . . . It is further pointed out that for breach of a contract of a parent concerning the religious education of a child no damages can be recovered and it cannot be enforced by a suit for specific performance." In support of this text, the author cites seven English cases, the oldest dating back to 1852.

The next is a note in the Yale Law Journal, Vol. 50, p. 1292: "By invoking jurisdictional limitations, many American courts have raised the tacit presumption that ante-nuptial contracts possess an enforceable legal status. As a matter of general policy, however, it would seem preferable for courts unequivocally to refuse enforcement. For the American doctrine of religious freedom necessarily subsumes a corollary privilege to change religious affiliations at will. This principle, coupled with the individual parent's duty to preserve his **independent** (sic) judgment with reference to the child's religious training, would seem to negate the prior contract. Moreover, the courts' inclination to overlook policy objections and to enforce otherwise valid contracts in the absence of express or implied legislative declarations would seem to be overcome in many jurisdictions by the terms of the religious freedom clauses of their state constitutions. In addition to the denial of power to establish an official religion, contained also in the First Amendment to the Federal Constitution, many state Bills of Rights affirm the individual's right to worship according to his own untrammelled volition. This affirmative grant would seem to place the privilege freely to change religious affiliations— whether one's own or those of minor natural children—among those inalienable liberties of speech and conscience which are not subject to restriction by private agreement."

The third in the Boston University Law Review, Vol. XXXV, No. 3, p. 333, is an exhaustive, critical analysis by Leo Pfeffer of the New York Bar. In dealing with the religious training of children, the author lays down thirteen postulates. The thirteenth: "**m. An agreement between parents respecting the religious upbringing of their children is without**

legal effect upon a court called upon to determine the child's future religious upbringing." (p. 360.)

The author first points out that the foregoing broad proposition is contradicted by Williston on Contracts and by the New York Court of Appeals. He then reveals that none of the authorities relied upon either by Williston or the court supports their proposition, saying: "Indeed, each is authority for the directly contrary position." One of these authorities is Weinberger v. Van Hessen, cited by defendant-father in case at bar. The Weinberger case was decided in 1932. In 1954 the same court, the New York Court of Appeals, decided Martin v. Martin, 308 N. Y. 136; 123 N. E. 2d 813. In the later case the court upheld "the decision of the lower courts that the child's welfare required deletion from a divorce decree of a provision, originally incorporated by reason of the parties' ante-nuptial agreement, that the child be raised in the Catholic faith. The opinion of the court in Martin v. Martin did not state that ante-nuptial agreements on the religious upbringing are by their very nature unenforceable. It simply disregarded the agreement and decided the case on the basis of the child's welfare." (p. 361.)

The author then goes on: "Nevertheless, despite the perhaps ambiguous nature of the holding in Martin v. Martin, the unsupported statements in Williston and in Weinberger v. Van Hessen, and a few lower court dicta, principally in New York and probably overruled by Martin v. Martin, it is fair to suggest that the authorities are almost unanimous in refusing to accord legal effect to agreements seeking to control the religious upbringing of children."

Among these "lower court dicta" are found the Kananack case, cited by plaintiff-mother, and the Ramon, Luck and Shearer cases, cited by defendant-father. In support of his text, the author cites the following cases: In re Butcher's Estate, 266 Pa. 479, 109 Atl. 683 (1920); Denton v. James, 107 Kan. 729, 193 Pac. 307 (1920); In re Dixon, 254 Mo. 663, 163 S. W. 827 (1914); State, ex rel. Baker v. Bird, 253 Mo. 569, 162 S. W. 119 (1913); Brewer v. Cary, 148 Mo. App. 193, 127 S. W. 685 (1910); Boerger v. Boerger (quoted extensively by plaintiff-mother) 26 N. J. Super. 90, 97 A. 2d 419 (1943); In re Walsh's Estate, 100 Cal. App. 2d 194, 223 P. 2d 322 (1950); In re Guardianship of Walsh, 114 Cal. App. 2d 82, 249 P. 2d 578 (1953).

The author continues (p. 362): "The indissolubility of a Catholic's marriage does not give him a greater claim to enforce the ante-nuptial contract, because only secular grounds for dissolubility are recognized in a secular court and non-performance of an ante-nuptial agreement for religious upbringing is not such a ground whether the promisee is a Catholic or a non-Catholic. There is in any event no basis for estoppel because the promisee, whether Catholic or not, got exactly what he bargained for—a promise that the children would be brought up in his faith. He could not bargain for judicial enforcement of the promise because it was not the promisor's to give. In the case of a Catholic party, the exaction of the promise was required in order to obtain ecclesiastical approval of the mixed marriage; the Catholic party, in all likelihood, no more expected to seek or obtain judicial enforcement of this promise than he did of the promise to love, honor and obey him. The agreement is

viewed by the parties as a religious act rather than a secular one having legal consequences. The Catholic Church, which insists upon the agreement, is under no illusions to its enforceability in a secular court." In support of the last statement, the author cites Bouscaren and Ellis, Canon Law, Text and Commentary, 517-518 (1951).

Continuing, he says (p. 363): "There are many reasons why such agreements should not be judicially enforceable. Aside from the unprovability of money damages and the impracticability of specific enforcement—the grounds most frequently stated—are the more cogent reasons set forth above for judicial non-intervention in the religious upbringing of children except where necessary to protect their temporal welfare. Whether the agreement is specifically enforced against one who has custody or is effectuated by awarding custody to someone who is of the faith specified in the agreement and who would otherwise not be given custody, the child's temporal welfare is sacrificed. To suggest that the agreement will only be enforced if the child's temporal welfare is not thereby prejudiced is meaningless; it is inevitable that, if an unwilling parent is forced by a court of law to rear his child in a religion which he disbelieves, the child will suffer. There is often no way to avoid visiting upon children the sins of their parents, but the courts, at least, should not be party to the injustice by enforcing the contract against a third party maleficiary. Besides, there is a strong policy in a democracy in allowing persons to worship God as their conscience now dictates, a policy that is equally applicable to teaching their children how to worship God. It would be contrary to this policy judicially to enforce a contract not to change one's own religious beliefs or practices; and it is equally contrary to this policy judicially to enforce a contract not to change the religious upbringing of one's children."

We wish to make it clear that our decision in the present case is neither condonation nor condemnation of the mother's repudiation of her solemn promise or of her violation of the court order. It is simply a holding that if the mother is to be deterred from her present course of action the dissuasion must be accomplished by means other than force. It is impossible for us to see how the State, through this or any other court, may employ the strong arm of the law to compel the mother to act contrary to her conscience in any matter pertaining to religion. It should be axiomatic that neither contract nor court order can deprive her of the right to change her mind where religion is involved. "Implicit in the American tradition of religious freedom are the concepts of voluntary entry and free exit. . . . the constitutional guarantee of religious freedom, which certainly includes freedom to change one's religion. Few will deny that effectuation by a state agency of a church's dogma of no-exit is offensive to American concepts of religious liberty and the separation of church and state." (Pfeffer, supra 385, 383.)

Lest someone gain a false impression that defendant-father is an inhuman monster seeking revenge by having the mother of his child imprisoned until she keeps her promise to send the child to the Catholic school, it should be noted that both at the oral hearing and in his brief, he made it clear that he has "no present intention or desire to see the

plaintiff imprisoned." Because of his unusual closeness to his church, the words of "The Pilot" (Mar. 6, 1954), official organ of the Boston Archdiocese, seem appropriate: ". . . for Catholics their faith is their most treasured possession." And: ". . . small wonder that they would wish to see it passed on to the coming generation as the road to their salvation as well."

The Catholic father would be well within his rights were he to place preservation of his faith above preservation of his family. Unfortunately for him, while the former may take precedence over the latter in an ecclesiastical tribunal, no faith or religious dogma may ever take precedence over a state constitution in a state court.

Plaintiff-mother is therefore found not guilty of contempt of court, and that branch of defendant-father's motion is denied. Exceptions are allowed defendant-father. The remaining branches of the motion may now be assigned for hearing. A journal entry may be prepared accordingly.