874 A.2d 606 (2005)
378 N.J. Super. 83
Howard FELDMAN, Plaintiff-Appellant,
v.
Bridget FELDMAN, n/k/a Bridget Howell, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted April 20, 2005.
Decided June 8, 2005.
*607 Bernard Weiss, Morristown, for appellant.
Bridget Howell, respondent pro se did not file a brief.
Before Judges NEWMAN, R.B. COLEMAN and HOLSTON, JR.
The opinion of the court was delivered by
NEWMAN, P.J.A.D.
This appeal involves the issue of the primary caretaker's authority post-divorce to decide the religious upbringing of the children and the secondary caretaker's limitation upon religious training and education *608 when exercising visitation which includes overnight stays where the parties have joint legal custody. We hold that the primary caretaker has the sole authority to decide the religious upbringing of the children and the secondary caretaker shall not enroll the children in training and education classes for programs in a different religion over the primary caretaker's objections when exercising visitation rights. The secondary caretaker is not barred from having the children exposed to religious services or holidays.
The pertinent facts are the following. Plaintiff Howard Feldman (plaintiff) and defendant Bridget Howell (formerly known as Bridget Feldman) (defendant) were married on June 8, 1996. Prior to their marriage they already lived together and had two children, a daughter, Shawn, born October 9, 1994 and a daughter, Hannah, born November 26, 1995. Their third child, a son, Jacob, was born after their marriage on April 22, 1998. Plaintiff is Jewish and defendant is Catholic.
Subsequent to her birth, Shawn was both baptized in the Catholic Church and given a Hebrew name in a Jewish naming ceremony. Subsequent to Hannah's birth, she was only baptized in the Catholic Church. She was not given a Hebrew name until after the parties' divorce and after this appeal had been filed. Jacob was both baptized in the Catholic Church and was circumcised in a bris, a Jewish ceremony representing a covenant with God.
Initially, while drafting the divorce agreement, it was contemplated that the children would remain in the primary physical custody of defendant. However, before the end of the day on October 10, 2001, the parties agreed that defendant was not capable of caring for the children due to her lack of stable employment, residence, and transportation and that plaintiff would be the temporary primary residential caretaker with visitation for defendant in accordance with a schedule set forth in the Property Settlement Agreement (PSA). The PSA is silent on the subject of the religious upbringing and education of the children. However, it provides each parent with custody of their children on their respective religious holidays and the parent's birthdays. When a Jewish and Catholic holiday conflict, as could be the case with Chanukah and Christmas at times, priority was given to the Catholic holiday. On November 12, 2001, the children went to live with plaintiff and remain with him to this day.
There have been numerous court proceedings involving financial issues, mainly support payments by defendant and arrearages accumulated for not making payments. The issue of religious upbringing has also been brought up. Defendant indicated that she would like to take the children to Confraternity of Christian Doctrine (CCD) classes in place of her weekly Wednesday or Thursday dinner visit. Following the September 12, 2002 hearing, Judge Rand ordered defendant's visitation with her children to continue as it had been and must take place at the home of her mother; that the three children of plaintiff shall be raised in the Catholic Church "as is consistent with their baptisms"; that the children shall be exposed to Jewish culture and traditions; and that the two older children, Shawn and Hannah, shall attend CCD as appropriate, with defendant being responsible for their transportation.
On October 3, 2002, defendant secured an Order from another judge, while Judge Rand was on vacation, restraining plaintiff from interfering with the children's attendance at the (CCD) education classes every Sunday from 9am to 7pm.
*609 On October 18, 2002, Judge Rand held another hearing. It is unclear which party filed a motion and for what purpose. However, the issue of religion was primarily discussed. Judge Rand clarified that he never intended that the CCD classes interfere with plaintiff's weekends with the children.
The same day, following the hearing, Judge Rand ordered plaintiff to inquire about CCD programs during the week near his home and to transport the children to CCD. Defendant was ordered to pay all fees associated with the CCD program.
On October 23, 2002, plaintiff filed an Order to Show Cause why the children should be raised in the Catholic religion.
On October 24, 2002, plaintiff appeared before Judge Rand on his motion for an Order to Show Cause. Plaintiff requested a stay of the September 12, October 3, and October 18, 2002 orders because compelling him to take his children to CCD classes was a violation of his constitutional rights as a Jewish person.
On the same day, following the hearing, Judge Rand ordered: a plenary hearing to decide how and by what method the children will be raised and educated in a religious manner; that all other issues raised in plaintiff's October 23, 2002 Order to Show Cause will be considered at the plenary hearing; and [a]ll Orders previously issued by the Court relating to the children's religious education and/or religious childrearing will be stayed pending the decision of the Court in the pending Plenary Hearing.
On November 1, 2002, a plenary hearing commenced on the issue of the religious upbringing of the children. At the hearing, defendant claimed that the PSA gives preference to the Catholic religious holidays, which is proof that they agreed to raise the children Catholic. Plaintiff testified that he did not agree to raise his children only as Catholic and that he expected them to also be raised in the Jewish faith.
On November 15, 2002, the plenary hearing on the issue of religious upbringing continued. At the end of that day, Judge Rand ordered, among other things, that Dr. Lee Monday of Hackettstown Psychological Associates conduct an evaluation of both parties in regard to the nature and extent of their religious upbringing of their children; that the initial cost of Dr. Monday shall be borne by plaintiff with the understanding that the ultimate allocation will be determined pending the decision on the plenary hearing; that the children shall not be interviewed by independent experts; that pending the report by Dr. Monday, each party shall be free to instruct the children in whatever religious belief or education they feel appropriate during their own visitation or custody time; and that the plenary hearing will continue at a later date.
On February 3, 2003, and March 18, 2003 the plenary hearing regarding the religious upbringing of the children continued. It was then adjourned and reconvened on May 14, 2003.
At the end of the hearing, plaintiff changed his position and argued that defendant should not be allowed to educate the children formally in the Catholic religion (i.e., no more CCD classes, even on her own time) because, as the primary caretaker of the children, he had the right to raise his children Jewish without any interference from anyone, even the non-custodial parent. Judge Rand discontinued any further testimony because he believed it would be merely cumulative and requested that plaintiff's attorney provide a memorandum on the law on his new position within two weeks.
*610 On August 13, 2003, plaintiff filed another motion alleging seventeen separate counts including violations of previous orders by defendant and updated requests for expenses and child support.
On August 15, 2003, defendant filed a cross-motion demanding, among other things, (1) transfer of physical custody of the children to her; (2) enforcement of divorce decree where it states that all disputes should be handled outside of court first; (3) that plaintiff cease using the court system to harass defendant and thereby making it impossible for her to gain employment, permanent residence and a vehicle; (4) to enforce divorce decree establishing that either parent must notify the other if taking children traveling out of town; (5) to continue the children's religious education in the Catholic church; and (6) to require Sussex County Probation Division to adjust its records on child support issues.
On September 12, 2003, the motion and cross-motion were heard again by Judge Rand. Judge Rand denied defendant's motion for a custody change. He also refused to address the religious upbringing issue:
I'll tell you one thing I'm going to not do, I am not going to touch the issue of religious upbringing with a ten-foot pole from thisfrom this vantage.
You each have your own point of view on the children's religious upbringings. I'm going to skip over and get right to that point. I did rule at some point, and I continue to rule on that point, that as for religious upbringing this is joint legal custody still, as I understand it, joint legal custody still
....
It's joint legal custody, and until and unless it becomes sole legal custody the parties will raise the children as they deem fit in regard to their own religious upbringings and untilin their own traditions, hopefully respecting the other, hopefully respecting the other, and until I can see these children are being harmed in some way, in this regard, harmed, I mean really, seriously harmed, there has to be some evidence, I am not going to interfere with it.
So the status quo will continue on that.
Later the same day, Judge Rand issued an Order which is the subject of this appeal requiring in pertinent part that:
1. The Court orders that the religious upbringing of the parties' children will continue in accordance with the status quo.
....
6. By separate order the Court finds that due to changed circumstances and the children involved in this case, the child support guidelines will be modified. This modification will be generated by the court. The Court will recalculate the parties' income as expressed on the record. The Plaintiff will provide his last three paycheck stubs to the court to be used in modifying the child support guidelines.
7. The [court] will, by Supplemental order address the issue of child support, retroactivity, and arrearages including fees and costs incurred in connection with this matter. The Court will also address lost income claims by the Plaintiff asserted in his papers.
8. All other issues on the motion and cross motions not specifically addressed in this order are hereby denied without prejudice.
In response to plaintiff's subsequent motion, this court determined that the September 12, 2003 order was final. This appeal then ensued.
On appeal, plaintiff raises the following issues for our consideration:

*611 POINT I

THE LOWER COURT ERRED IN NOT GRANTING PLAINTIFF-APPELLANT AS THE PRIMARY CARETAKER OF THE CHILDREN THE GREATER OR OVERRIDING AUTHORITY TO DETERMINE QUESTIONS RELATING TO THE CHILDREN IN THE EVENT OF DISAGREEMENT BETWEEN THE PARTIES.
POINT II
THE LOWER COURT ERRED BY NOT DEFERRING THE RELIGIOUS UPBRINGING OF THE CHILDREN POST-DIVORCE TO THE PROVINCE OF THE PRIMARY CARETAKER AND DETERMINING THAT, SUBJECT TO THE PARAMOUNT CONSIDERATION TO FOSTER THE BEST INTEREST OF THE CHILDREN, THE VIEWS AND DECISIONS OF THE PRIMARY CARETAKER SHOULD PREVAIL.
POINT III
THE LOWER COURT ERRED BY REQUIRING PLAINTIFF-APPELLANT TO FIND A CCD AND TAKE HIS CHILDREN THERE IN VIOLATION OF PLAINTIFF-APPELLANT'S CONSTITUTIONAL RIGHT NOT TO BE COMPELLED TO DO AN AFFIRMATIVE ACT IN SUPPORT OF AN ORGANIZED RELIGION NOT HIS OWN OR FOR THE PLAINTIFF TO BE COMPELLED TO DO ANY ACT IN SUPPORT OF A RELIGION NOT HIS OWN.
POINT IV
THE LOWER COURT ERRED BY REFUSING TO MAKE ANY FINDING OR TO GRANT OR DENY PLAINTIFF-APPELLANT'S MOTION FOR A DETERMINATION OF THE ISSUE WITH RESPECT TO THE RELIGION OF THE CHILDREN AND THE FINANCIAL ISSUES PROPERLY BROUGHT BEFORE IT AT ITS DIRECTION.
Plaintiff argues that as the primary caretaker of the children, his decisions regarding the day-to-day care of the children should take precedence over the views of defendant, the secondary caretaker, in the event of disagreements between the two.
In points I and II plaintiff also argues that as the primary caretaker, he has the unfettered authority to determine the religious upbringing of the children under his charge, including the manner of the children's religious education. Plaintiff further objects to the children having any formal religious instructions outside the Jewish faith and that as primary caretaker, it is his right and duty to determine what religious instructions the children should receive.
The law is clear that the primary caretaker has the right to determine the religious upbringing of the children in his or her charge. Esposito v. Esposito, 41 N.J. 143, 146, 195 A.2d 295 (1963); McCown v. McCown, 277 N.J.Super. 213, 649 A.2d 418 (App.Div.1994); Wojnarowicz v. Wojnarowicz, 48 N.J.Super. 349, 137 A.2d 618 (Ch.Div.1958); Boerger v. Boerger, 26 N.J.Super. 90, 97 A.2d 419 (Ch.Div.1953). The essential principles were well-articulated in Brown v. Szakal, 212 N.J.Super. 136, 140-41, 514 A.2d 81 (Ch.Div.1986) where the court said:
There is no question that the custodial parent here by contract has the right to select the religious upbringing of the child. If there was no contract, such would still be the right of the custodial parent. Boerger v. Boerger, 26 N.J.Super. 90, 101, 97 A.2d 419 (Ch.Div.1953). The courts will not interfere with the selection by the custodial parent on religious training. Wojnarowicz v. Wojnarowicz, *612 48 N.J.Super. 349, 354, 137 A.2d 618 (Ch.Div.1958); Esposito v. Esposito, 41 N.J. 143, 146, 195 A.2d 295 (1963). The policy behind this judicial reluctance to interfere with the religious training of the children is that it is in the best interest and welfare of the children ... that the custodial parent be the one to control their religious upbringing. Wojnarowicz v. Wojnarowicz, supra, at 354, 137 A.2d 618.
[Id. at 140-41, 514 A.2d 81.]
In McCown v. McCown, supra, the residential custodian (the "primary caretaker") converted to Orthodox Judaism after the couple divorced. Prior to the marriage and during the marriage both parties were Protestant and were raising their two children within that religion. After the divorce, the mother converted herself and her daughters to Orthodox Judaism. She sought to modify the Property Settlement Agreement so that the father could not compel the daughters to violate the Jewish dietary laws during his visitation with the girls. McCown, supra, 277 N.J.Super. at 216, 649 A.2d 418. She also sought to prohibit the father from taking the girls to church. Id. at 217, 649 A.2d 418. The father objected on the basis that the changes to the settlement would have interfered with his ability to see his daughters on weekends and would prohibit the girls from learning about his and their mother's former culture and religion. Ibid. The Chancery Division granted the mother the right to raise her children in her home according to the Orthodox Jewish religion. Ibid. However, the court allowed the children to follow the religious practices of the father when they are with him, provided that he may not enroll them in a Christian Sunday School or other formal religious educational program. Ibid.
On appeal, in McCown, we did not address the issue of whether the father should be able to also take his daughters to Christian Sunday School because the parties' arguments were limited to the sole issue of whether the children should attend Yeshiva or public or non-religious private school. Id. at 218, 649 A.2d 418. However, we concluded that, in general, the trial judge's findings were supported by sufficient credible evidence in the record and that his orders were proper in achieving the best interests of the children. Id. at 219, 649 A.2d 418.
We had this to say about the court's role in addressing the issue of religious upbringing:
The courts do not choose between religions, see Asch v. Asch, [164 N.J.Super. 499, 397 A.2d 352 (App. Div.1978)], and entertain no view in that regard. We do no more than seek to establish secular rules to minimize the conflicting pressures placed on the children and permit them to steer a course between the conflicting views and beliefs of their parents. This course hopefully, in furtherance of our paramount interest in the best welfare of the children and subject to that interest, will give effect to the legitimate expectations of each of the parents with respect to their children's upbringing and the legitimate right of the children to understand their heritage. The orders which we affirm endorse neither the religion nor the culture of either parent but are intended to insure that the children have the opportunity to participate in the cultural household routine and religious practices of both parents.
[Id. at 219-20, 649 A.2d 418.]
Here, the three children participated in both parents' faiths, through ritual ceremonies and holiday celebrations. The parents tell conflicting stories as to what was anticipated in terms of religions for their children at the beginning of their marriage. *613 Defendant asserts that they agreed that she would raise the children Catholic and they would be exposed to Jewish rituals and holidays with plaintiff's family. Plaintiff claims that he agreed to allow her to train them in the Catholic faith during the marriage, but that he had not waived his right to raise them as Jews now, especially since the marriage was dissolved and he has physical and primary custody of the children.
In any event, the children's attendance in Catholic Church services has been sporadic. Defendant has only recently enrolled the eldest child in CCD classes. The younger children, due to their age, had yet to receive any formal education in CCD classes at the time of this appeal. Likewise, plaintiff has not yet enrolled the children in Hebrew school, however they were not age appropriate at the time of this appeal.
The parties' PSA is silent as to the religious upbringing of their children. The only mention of religion is the designation of Jewish and Christian holidays during which each party may have custody. There is a recognition that each parent's religion is important to them and they wish to be with their children on their respective holidays. At the time the agreement was drafted, the parties had agreed that defendant would have primary custody and therefore agreed that if a Jewish and Catholic holiday overlapped, such as Christmas and Chanukah, the children would stay with the mother for Christmas. Of course, Chanukah lasts for eight days and Christmas eve and Christmas is only two days, so the overlap is not all embracing. However, the day that the PSA was signed, the parties changed the custody arrangement, giving primary custody to plaintiff, in recognition that defendant could not provide a stable home for the children at the time.
Religion was not even an issue in the divorce until defendant filed a Motion on September 12, 2002, requesting that it be ordered that the children attend CCD classes. Judge Rand found, at the time, that because the children had been baptized in the Catholic church, they should attend CCD Classes. However, he ordered that defendant take them to classes during her weekly visitation time period on Wednesday or Thursday nights. Apparently, defendant could not find a CCD program that was convenient for her children to attend on weeknights. Thereafter, she enrolled Shawn in a CCD program on Sundays, without regard to the fact that plaintiff has custody of the children every other weekend. After plaintiff took the children away on one of his weekends, defendant sought an order from another judge, in Judge Rand's absence, to prohibit plaintiff from interfering with CCD classes on Sundays and giving her visitation every Sunday from 9am to 7pm. This ignited the religious debate.
Upon his return at the October 24, 2002 hearing, Judge Rand ruled that he never intended for CCD to interfere with plaintiff's custody or visitation. He then ordered plaintiff to find a CCD class near his house and take the children on weeknights. Plaintiff objected to this order as a violation of his constitutional rights and Judge Rand stayed his previous order on October 24, 2002.
During the November 1, 2002 hearing on this issue, plaintiff advised the court that he had only objected to being affirmatively compelled to take the children to CCD classes, but had no objection to defendant simultaneously taking the children to CCD during her own visitation time. However, subsequently at the hearing on May 14, 2003, plaintiff changed his position and requested that the court prohibit defendant from enrolling the children in any *614 further CCD classes. At no time has plaintiff requested that the children be barred from attending Catholic church services when they are with their mother. He does not want to interfere with defendant's right to have the children accompany her to church.
On August 13, 2003, plaintiff brought a motion to settle all of the outstanding financial debts that defendant owed to plaintiff, to require that defendant finally start paying the child support she had been delinquent in paying for almost two years, and for the court to order that as the primary caretaker, he may raise the children Jewish.
On September 12, 2003, Judge Rand declined to make any ruling on the religious issue other than to say that he will not interfere with either parent's right to expose their children to their own religion and continued the status quo.
Because Judge Rand had clearly retreated from his original ruling and determined that plaintiff may raise his children in the Jewish faith, the actual issue before this court is whether allowing defendant to simultaneously send her children to CCD classes is interference by the court in plaintiff's right to raise his children in his own Jewish faith.
Judge Rand expressed a legitimate concern that plaintiff's primary custody is supposedly "temporary" and it would cause a problem or hardship on the children if he ruled that they must be raised Jewish and then primary custody switched back to defendant, who would then have a right to forbid the children from taking any more Hebrew classes and enroll them solely in CCD. However, as the court observed in Wojnarowicz, supra, 48 N.J.Super. at 355, 137 A.2d 618, custody is always temporary and can be reassessed based on a change in circumstances. This did not stop any of the previous courts from allowing the primary caretaker at the time of the hearing or appeal from establishing the children's religious training over the objection of the other parent.
Moreover, defendant has made little to no progress since the divorce in getting her life together. Her application for a change of primary custody was denied on September 12, 2003.
Allowing the non-custodial parent to formally educate the children in a second religion, through CCD classes, as here, runs contrary to the right that the primary caretaker has to educate the children in the religion of his choice. This decision does not prohibit the mother from taking her children to religious services of her choice during her visitation, which is her constitutional right. It is implicit in protecting the primary caretaker's right to raise and educate his children in his chosen religion to prevent others from simultaneously educating the same children in an alternate religion.
We issue a caveat. The court at all times must look out for the best interests of the children. Till now, the children have been exposed and somewhat educated in both religions. The eldest has already reached her first Communion in the Catholic Church. The younger two have not had nearly as much exposure. However, none of the children were old enough to attend Hebrew school at the time the lower court decision was made in 2003. Plaintiff contemplated enrollment of his children in Hebrew school as soon as they were of age. Plaintiff initially did not object to the children being educated in both religions, so long as he could take them to Hebrew school and not have to be involved or inconvenienced by their Catholic education. He changed his mind and believes the children should not be pulled between two religions. Plaintiff had the right to *615 make this decision. To the extent that this is not recognized in the order under review, the order should be modified.
Additionally, plaintiff argues that the trial judge's order requiring him to take his children to a CCD program near his home and his comments regarding allowing plaintiff's daughter to wear a Catholic necklace in his home was an "unlawful abridgement of [his] constitutional rights under the First Amendment to the United States Constitution."
In Brown v. Szakal, supra, the court ruled that the non-custodial father could not be compelled to obey the Jewish Sabbath and dietary laws during visitation with his children. In making this determination, the court cited In re Adoption of E., 59 N.J. 36, 279 A.2d 785 (1971), stating the following:
[T]he decisions of this court must neither violate the mother's or the children's constitutional right to religious freedom nor permit the imposition upon the father of the mother's religion which imposition would violate the father's constitutional right of freedom of religion. The United States Supreme Court has distinguished between the freedom to believe and the freedom to exercise one's own belief pointing out that the former is absolute, the latter is not. The freedom to practice must be weighed against the public welfare. Cantwell [v. State of Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903 84 L.Ed. 1213 (1940)]. This court holds it must also be weighed against an individual's right not to be compelled to abide by the rules of another's religion.
[Brown, supra, 212 N.J.Super. at 139-40, 514 A.2d 81.]
There is no question that a court order compelling a person to affirmatively participate in a religion, not their own, is state action and therefore a constitutional violation.
However, in this case, plaintiff is not compelled under any existing court order to participate in any religion not his own. While plaintiff is correct in objecting to the trial court's initial order that he take his children to CCD as a violation of his religious freedom, the trial judge recognized the problem early on and stayed that order. Following the stay, the trial judge held a plenary hearing and withdrew his order compelling plaintiff to take the children to CCD classes or any other Catholic activity. In fact, the September 12, 2003 order under review here specifically states that "the religious upbringing of the parties' children will continue in accordance with the status quo." The "status quo" refers to each party's right to raise their children with their own religious practices when they have custody of the children.
In regard to the objection to plaintiff's daughter Shawn wearing a locket with a cross while in plaintiff's household, the following colloquy ensued between plaintiff, his attorney and Judge Rand.
MR. FELDMAN: My house is a Jewish household. We do not have crosses in our house.
THE COURT: Mr. Feldman, grow up. Understand life.
MR. FELDMAN: This is a religious issue, Your Honor.
THE COURT: It is?
MR. FELDMAN: Yes, it is.
THE COURT: Well, do youdo you have a problem with that?
MR. WEISS: I do, Your Honor.
THE COURT: Do you have a problem with that Mr. Weiss?
MR. WEISS: Your Honor, it was on my advice the Mr. Feldman told his daughter.

*616 THE COURT: That was your advice? Well, your advice is bad advice, Mr. Weiss. It is self centered. It is narrow-minded advice. Understand this, you are going to have to understand that you have a multicultural situation here. If you want to draw the line, I suggest you draw it somewhere else. This child is a human being, not a pawn. The more you do this, Howard, the more you tell her she can't have this tradition, guess what's going to happen?
MR. WEISS: Your Honor,
THE COURT: She's going to do it.
MR. WEISS: Your Honor, if I may,
THE COURT: Yes.
MR. WEISS: She was not told she can't have that tradition. She was told that that piece of jewelry was inappropriate in this household. That's all she was told.
....
THE COURT: Let me say this to you, understand this, that if this keeps up, if these children are not respected as individuals, I will change custody in a heartbeat. Just understand that, and you can take that to the Appellate Division. I'll have a hearing, and I'll make the necessary findings, and I'll have the children in here, and I'll change custody. I will do it. I will do it, Mr. Feldman, because I will do it because it's in the interest of the children. I will not have them used to advance somebody else's agenda. I don't care whether its Hasidic. I don't care whether it's Jesuit. I don't care whether it's Muslim. I don't care what it is. The children will not be used as a vehicle. You cannot enforce your personal views in this situation to their detriment. They are being exposed to a multicultural reality. If you don't understand that, if you can't live with it, then you will suffer and they will suffer. That is not what I want to happen. Do you understand that? You apparently do not. Well, then we'll have a hearing....
While Judge Rand may have become irritated during this discourse, he was not expressing a preference for the Catholic religion. He was attempting to respect the religious freedom of the child. At the same time, Judge Rand did not require plaintiff to allow his children to wear a symbol of Catholicism in his home in the order issued later that day. Thus, there is no judicial directive compelling plaintiff to tolerate a religion other than his own.
Nonetheless, plaintiff contends that even if this court finds no constitutional violation and remands this matter on the child support and other financial issues, plaintiff requests that the remand be to a different judge. Plaintiff refers to the judge's "outbursts," his "disregard for the rules of the court," his failure to enforce his previous orders, and the judge's use of the word "vexatious" which creates the appearance that he disfavors the parties.
We disagree. In this litigation seemingly without end, Judge Rand has exhibited remarkable restraint, trying to hold the judicial line without becoming entangled with religious disputes engendered by the parties. Our courts have repeatedly invited the parties to resolve these issues between themselves. The court here recognized its "hands-off" role which was best described by our Court of Errors and Appeals in Donahue v. Donahue, 142 N.J.Eq. 701, 703-04, 61 A.2d 243 (E. & A.1948), when it commented:
No end of difficulties would arise if judges sought to proscribe the selection of a religious faith made by a parent having custody. See People ex rel. Sisson v. Sisson, 1936, 271 N.Y. 285, 287-88, 2 N.E.2d 660, 661. Intervention in matters of religion is a perilous adventure *617 upon which the judiciary should be loathe to embark.
We are convinced that there is no basis to remand this matter to a different judge.
In regard to Judge Rand's lack of enforcement of prior orders, he explained that he was reluctant to incarcerate a person where she is making some effort to comply. However, the judge may reach a point where he has to resort to more drastic measures, including incarceration if nothing else works, to maintain the integrity of the court's orders.
Furthermore, there is a preference by the court system to have one judge hear all motions in the same matter in the interest of fairness to both parties. See Salch v. Salch, 240 N.J.Super. 441, 444-45, 573 A.2d 520 (App.Div.1990). No one knows this case better than Judge Rand. We are confident that he will follow through on what he indicated in his September 12, 2003 order if he has not already done so.
Plaintiff requests that this court settle the financial issues left unresolved by the lower court.
When plaintiff filed his brief on July 27, 2004, apparently no subsequent order enforcing child support, retroactivity, and arrearages of fees and costs incurred by plaintiff, as set forth in paragraph 7 of the September 12, 2003 order had issued. No answering brief was filed by defendant. Over eight months have passed. We have no information on what may have transpired in the trial court in the interim. Moreover, it is not this court's role to make the factual calculations that the trial court contemplated making. Additionally, the record before us does not have each party's wage stubs and other financial documents that would be necessary to make such calculations. Given the passage of time, it may be necessary to have current financial statements.
As modified, the matter is remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.