In re application of HARRY F. DE BOIS, on *habeas corpus* for custody of Mary De Bois.

[Decided November 18th, 1929.]

*Mr. James S. Turp,* for the petitioner.

*Mr. Peter Backes,* for the respondents.

BUCHANAN, V. C.

Petitioner by this proceeding seeks to obtain the custody of Mary De Bois, a minor aged seventeen, the offspring of petitioner and Mary Martin (Kane) De Bois. The original writ was directed to John Stahley and Annie Stahley, his wife. Their return based their claim to custody on a commitment of the child to St. Michael's Aid Society, by the Mercer county court of common pleas, and the subsequent placing of the child with them by said society. That society also filed a return and became a party to this proceeding—basing its claim to custody on the commitment aforesaid.

During the course of the proceedings the respondents Stahley abandoned claim to custody—leaving the contest between petitioner and the respondent society.

The proceeding is one to determine the custody, under the jurisdiction of this court as *parens patriæ*. *Ex parte Hoines, 112 Atl. Rep. 613.*

Petitioner's claim to custody as the father of the child is disputed on the allegation that the child is illegitimate. There was much testimony on this issue, some of it conflicting. Most, or much, of petitioner's testimony was corroborated by other testimony and evidence; the balance is corroborated by these facts, and by his appearance and manner (which were such as to inspire confidence) and by the evident falsities and animus in the testimony of at least one of the witnesses for respondents.

Unquestionably the petitioner is the actual father of the child. The relations between him and the mother were meretricious in their inception, but it is evident that the two lived for many years as husband and wife, and that petitioner conducted himself with a due sense of the responsibilities of a husband and father and a practical belief that he was such. The argument that there was no valid ceremonial marriage is as technical an argument in this case as such an argument can ever be.

Assuming that the mother had been in fact the wife of Kane, with whom she had lived at a period antecedent to her relationship with petitioner, the evidence shows that Kane had not been heard of for some years (one witness, I think, said twelve years) and has never since been heard of during the past twenty odd years, and justifies the presumption that he was dead at the time of the alleged common law marriage. Even if the disappearance of Kane had continued for less than seven years, the presumption against bigamy or adultery, would overcome the presumption of Kane's continuance of life. *Tyll* v. *Keller, 94 N. J. Eq. 426.* The mother objected to a ceremonial marriage, for some reason which is not quite clear, but I am satisfied that, at a time when Kane was to be presumed, and was believed to be, dead,

the petitioner and the mother agreed with each other to be husband and wife, and that they acted accordingly and lived for many years as such, and were so regarded and accepted in the several communities in which they lived; that the children were likewise regarded as legitimate, and are so to be regarded in this suit.

It is next claimed that the petitioner abandoned the child and so lost any and all right to custody. The evidence satisfies me to the contrary. It appears that the mother some months before her death drove the petitioner from the house; notwithstanding which he voluntarily took care of the support of the children by sending a generous share of his earnings; and that the fact that the family came to destitute circumstances was due not to fault of the petitioner but to profligate habits developed by the mother. Petitioner was a marine engineer, and was necessarily absent on long voyages; he did not know of the death of the mother and the commitment of the children for some time after it happened, and there is no evidence that any attempt was made to get this information to him. The evidence as to his subsequent conduct and efforts to get the custody of these children, in view of all the circumstances, clearly indicate that there was no abandonment.

It is next urged that the commitment of the child to the respondent society precludes the success of petitioner in this suit. The order was made in September, 1925, shortly after the death of the mother, while the father was absent, on the petition of the superintendent of the respondent society; the petition makes no mention of the father but asserts the children are illegitimate; the father not only had no knowledge or notice, but no attempt was made to give him any such notice or opportunity to be heard. To say that such an order, made under such circumstances, has conclusively disposed of the rights of this father is to assert a proposition diametrically opposed to the inherent spirit and fundamental purpose of a court of equity.

That such an order is valid, aside from the rights of the father, and that a statute providing for such proceedings is

essential for the care of children in the absence of parental care, may be conceded; but it cannot be assumed that the legislature intended to attempt to oust the jurisdiction of this court, nor that such an attempt, if so intended, could be constitutionally valid. The purpose and intent of the legislature in such statutory provisions, is simply to provide for the care of children who are in fact left in such circumstances as to render them liable to become a public charge, during the time that such circumstances continue. See *Ex parte Hoines, supra.*

Moreover, the particular order in the instant case can be no bar, for it is invalid for reasons appearing on the face of the record. The order is expressly made (in 1925) under the statute of 1915. *P. L. 1915 ch. 246 p. 441.* By the terms of that statute, as amended (*P. L. 1918 ch. 85 p. 220*), the making of the order is conditional upon the conviction of the prior custodian of abandonment or abuse of the child; this is jurisdictional. In the instant case the record shows no such conviction, and there was none in fact.

The evidence shows that the petitioner is an industrious man, able as well as anxious to support and care for his daughter, that he has a suitable home, presided over by a second wife who is also desirous of having the child, and indicates that the welfare of the child will best be served by awarding the custody to him. Against this is urged only the claim not of another parent or relative but of a corporate institution—which in the usual course would itself place the child with some foster parent (as it had done in the past). That it should attempt thus to give the child to a stranger instead of to her own father seems indeed regrettable. There is no claim that the father is unfit or the home unsuitable; the arguments are, as I have called them, technical. The explanation is found in a letter from the superintendent to the father, in which his liberality in providing for the children is admitted and commended, and the refusal to surrender the child to him is expressly based on the fact that the child is of the Roman Catholic faith (the institution being likewise

of that denomination), and the petitioner and his wife being attendants of a different church.

The question of religious faith and education is of course one to be taken into consideration in such cases as this, but assuredly it is not true, either as a legal or a practical proposition, that that factor is controlling above all others. And when it appears, as it does in this case, that petitioner and his wife are entirely willing that the child shall continue in that faith, its importance as a factor diminishes almost to the vanishing point.

It may be added that the child is seventeen years of age and of normal mental development, and that her desire is for her father as guardian—this is a factor entitled to strong consideration.

It is concluded that petitioner is entitled to the custody he seeks.