IN THE MATTER OF THE ADOPTION OF A CHILD BY
ROBERT B. JACQUES AND JOAN A. JACQUES, HIS
WIFE.

Superior Court of New Jersey
Chancery Division

Decided January 23, 1958.

*Mr. Morris Roth,* attorney for plaintiffs.

*Messrs. Weiner, Weiner & Glennon (Mr. John T. Glennon* appearing), attorneys for Robert Dickinson.

MARIANO, J. S. C.   Plaintiffs seek to adopt Robert Richard Dickinson, a minor above the age of 14, to change his name to Robert Richard Jacques.   Defendant, natural father of the infant, opposes the application and has not executed a written consent thereto.

Upon complaint and answer a full hearing was held during which all the parties in interest, including the infant, testified.

At the outset, in view of the absence of the written consent of the father, a question of jurisdiction arises.

■ *N. J. S. A.* 9:3–20 (*L.* 1953, *c.* 264, *sec.* 4, *p.* 1770, effective January 1, 1954) states the court in which an adoption action shall be instituted. It provides:

"An action for adoption shall be instituted in the Superior Court; or it may be instituted in the County Court of the county in which the plaintiff is domiciled, except that * * * (b) whenever a parent of the child to be adopted was granted a divorce from the other parent by the Superior Court, the action shall be instituted in the Superior Court * * *."

Since the natural parents have been divorced in New Jersey, there is no doubt that the suit was instituted in the proper court.

■ Neither the present statute nor rules of court require that the natural parents consent to the adoption. *N. J. S. A.* 9:3–19 permits a natural parent to "place, offer to place, or assist in the placement of a child for the purposes of adoption"; if this provision were to be construed as requiring at least one parent's consent then in the instant case, the natural mother has duly consented in writing.

*R. R.* 4:112–2, which deals with contents of the complaint to be filed in an adoption proceeding, has many requirements, none of which is consent of either natural parent.

True, *R. S.* 9:3–4, repealed by *L.* 1953, *c.* 264, effective January 1, 1954, provided that when the consent of one parent was not presented with the petition by reason of divorce, if the court granting the divorce has made an award of the custody of the child, consent of such court to the adoption must be presented with the petition. This statute was not re-enacted by the Legislature. When the repealed statute was in effect and the consent of the court was given, the hearing court still concerned itself with facts showing whether or not the best interests of the child would be promoted by permitting the adoption. *Stawicky v. Stawicky,* 12 *N. J. Super.* 72 (*App. Div.* 1951).

By the repeal of the requirement for the consent of the natural parents, the Legislature removed an incongruous situation from this field of law, where a justified adoption advantageous to the best interests of the child could be defeated.

Even if statutorily the consent of the natural father was required, the court would not want for jurisdiction.

██ In dealing with the custody and control of infants, their welfare and happiness, and not their filial affections, is the primary consideration. The natural right of the father to the custody of his child is not an absolute property right, but rather a trust reposed in the father by the State as *parens patriae*. *Lippincott v. Lippincott*, 97 *N. J. Eq.* 517 (*E. & A.* 1925).

The present statute *N. J. S. A.* 9:3–27, *sec.* (*C*), evinces this governing policy:

"If, from the report and the evidence presented, the court shall be satisfied that the best interests of the child would be promoted by the adoption, the court shall enter a judgment of adoption."

In addition to the above, our former Court of Errors and Appeals in *Winans v. Luppie*, 47 *N. J. Eq.* 302 (1890), reversed the Prerogative Court, which had adjudged that the statute entitled "An Act providing for the Adoption of Children," approved March 9, 1877, *Rev., p.* 1345, then in existence, required the written consent of the parents as well when the child is under the age of 14 as afterwards, and held that under the mentioned statute a parent may be deemed to have abandoned his child, so as to render his written consent to the adoption of the child unnecessary when his conduct has evinced a settled purpose to forego all parental duties and relinquish all parental claims to the child. Also, that when such an abandonment has taken place and certain conditions subsequently arise, such an abandonment may lawfully be deemed irrevocable. See *Gardner v. Hall*, 132 *N. J. Eq.* 64, 78 (*Ch.* 1942) affirmed 133 *N. J. Eq.* 287 (*E. & A.* 1943); *Lavigne v. Family and Children's Society, &c.*, 11 *N. J.* 473, 480, 481 (1953).

■ It would be strange indeed if it were permitted on one hand to say that adoption must be denied if one parent fails to consent, and on the other hand say that a parent who has forsaken parental obligations may still defeat an adoption by withholding his consent.

Our statute, *N. J. S. A.* 9:3–24(*C*), concerning the preliminary hearing, states:

"If the court shall determine, from the report of the approved agency and the evidence presented at the preliminary hearing, that a parent of the child sought to be adopted * * * or has forsaken parental obligations * * * the court may declare that such parent has no further right to custody of the child."

The facts hereinafter set forth will most certainly establish a wilful and continuous neglect or failure to perform the natural and regular obligations of care and support of a child.

■ This court, therefore, has jurisdiction in an adoption matter notwithstanding the absence of consent by the natural father, and also where a parent is deemed to have abandoned his child so as to render his written consent unnecessary in the event such was required.

The following facts were established during the course of the trial.

The infant child, born on September 9, 1943, was less than one year old when his parents separated, after which he was placed in a foster home. A short time thereafter the Middlesex County Probation Department was instrumental in having the custody of the child given to the grandmother until such time as the natural mother could provide a proper home, which never materialized. The paternal aunt, and plaintiff herein, resided with her mother and they both cared for and supported the infant child. For a short time after the maternal grandmother obtained custody, the defendant father lived in the same house but did not support his child. The parents of the child were finally divorced, the final judgment being dated September 30, 1947. The judgment *nisi* contained a provision awarding custody of the child to the father, with the reservation

that the said child should remain with his grandmother, Mrs. Anna E. Dickinson. The divorce action was not contested by the mother of the infant.

In 1947 the defendant remarried but the child remained with his grandmother and aunt, both of whom continued to provide support, care, guidance, love and affection.

In 1948 defendant, after an argument with his present wife, went to California and remained for six months. During this period he did not manifest the slightest interest in the welfare of his son.

On July 31, 1948 the child's paternal aunt, the female plaintiff, and the male plaintiff were married.

From 1948 to 1951 the child continued to reside with his grandmother and plaintiffs. During this time, and since, male plaintiff assumed the financial responsibility for the family group.

In February 1951 plaintiffs moved into a home purchased by them. They sought and received the approval of the defendant and his mother to take the young boy to their new home, where he has remained up to the present time. In 1954 plaintiffs approached the child's natural father regarding adoption, but met with a refusal. Again in 1955 and 1956 adoption was discussed, but defendant refused. Nevertheless, plaintiffs, not wishing to be denied the honored privilege of adopting the child, filed their complaint in this court on February 19, 1957. Subsequently, the defendant was interviewed by a representative of the New Jersey State Board of Child Welfare, during which he expressed a willingness to consent to the adoption, provided that the child's name would not be changed from Dickinson to Jacques. Plaintiffs would not agree to this condition or stipulation.

The plaintiffs have three children of their own, James Robert born June 4, 1949, Richard Branson born April 11, 1952; Jo Ann born October 3, 1956.

The three children are devoted to the child sought to be adopted, who reciprocates. They refer to each other as

brother and sister. A very close, intimate relationship among all four exists and the three are eager that the adoption be allowed and consummated. Incompatibility does not exist. The home of the plaintiffs is more than modest and adequate. It is situated in a very pleasant residential section and is within walking distance of schools and church. There is no question of the financial ability of the plaintiffs to provide in a proper fashion, not only for their own three children, but for the child sought to be adopted as well. In fact, plaintiffs have at all times refused to accept the recent and very seldom offered payment of an insignificant sum for the support of the child.

The defendant and his second wife lived in the home of his mother from 1951 to 1953. During this period $10 per week was given by the defendant to his mother for the support of the child, but the money was promptly put in a trust fund for the child's benefit, even though the child was residing elsewhere with the plaintiffs. Upon leaving the premises of his mother, the defendant insisted that he be given the bank pass book showing the deposits in the trust fund account amounting to $1,046.86, which he promptly withdrew and deposited in his own name and used a large part thereof for his own personal needs, so that there remains only the sum of $500.

Since 1951 defendant's visits to his child have been so infrequent that it manifests a complete lack of interest whatsoever in its welfare or happiness. He doesn't even know the name of any one of his son's teachers.

Defendant does, however, admit that his child is being taken care of in a fine manner, particularly as to his health and academic training.

The adoptive child is aware of his status in the home of the plaintiffs. He attends high school and is considered a good student. He intends to enter a college or university and has saved $300 for this purpose from his earnings as a newspaper delivery boy. Like all normal, healthy, vigorous youngsters he is interested in all forms of athletic activities. His religious training is not neglected, for he regularly

attends Saint Paul's Evangelical Reformed church in Milltown, New Jersey.

The child has regarded and refers to plaintiffs as mother and father and accords them the admiration, obedience, love and devotion of a son. It is the child's expressed desire to be adopted by the plaintiffs and to be personally known as Robert Dickinson Jacques. This he has made known to his natural father. The situation which distresses the father most is the child's willingness to have his name changed. The father's attitude in this respect has so disturbed the child that from the witness stand he expressed a wish that the court make a decision for him.

The adoptive child persisted in his desire to be adopted, even though subject to proper vigorous cross-examination concerning the legal and moral effect of permitting the adoption. The boy's testimony and the report of the State Board of Child Welfare (Exhibit P-3), indicates his understanding and desire with respect to these proceedings.

█ There could be no doubt in any one's mind that the adoptive child is above average intelligence for one his age and that he has attained that ripened discretion which enables him to determine what his own interests and welfare demands, and that he possesses the impartial acumen necessary to make an accurate appraisal of the facts surrounding the proceedings.

There remains to be determined: (A) whether the natural father has forsaken his parental obligations; (B) whether the best interests of the child would be promoted by permitting the adoption.

## (A).

█ The statutory (*N. J. S. A.* 9:3–18(*d*)) notion of the phrase "forsaken parental obligations" does not necessarily imply that the parent has deserted the child or even ceased to feel any concern for its interests. In my judgment, it imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and

relinquish all parental claims to the child. Such a purpose certainly forms a more reasonable ground for permitting a judicial determination whether another has assumed these claims and duties. *Winans v. Luppie, supra.*

All the facts of the case need not be repeated. Suffice to state the following: Since the child was less than one year old until the present time, a space of about 14 years, he has been trained, nurtured, maintained, educated, both secularly and religiously, loved when needed most, comforted and nursed when sick by first his grandmother and aunt, and then by the same aunt and her husband, plaintiffs herein.

The factual circumstances definitely evince defendant's determination to transfer all his parental duties and to surrender all like claims with regard to his son, and he continued in that purpose and a course of conduct accordant with it ever since the child was less than one year old.

However, it does not follow that the purpose may not be repented of; but once the abandonment is shown to have existed, it becomes a judicial question whether it can be terminated consistently with the welfare of the child. Here the child has, based on the abandonment, formed new ties and taken a new station in life, and it would be unjust not to consider the abandonment irrevocable. *Winans v. Luppie, supra.*

█ It is my opinion that the defendant has wilfully and continuously neglected or failed to perform the natural and regular obligations of care and support of his child.

### (B).

No charge of unfitness is made against the plaintiffs, and there is nothing in the evidence before me which would in the slightest degree indicate their unfitness.

It has been shown beyond doubt that plaintiffs are capable, conscientious, of fine character, maintain a fine home, are solicitous of the welfare of the child sought to be adopted, and would make excellent parents, and are good, clean, wholesome, God-fearing Christian people with a real genuine parental affection for the young man.

An infant begins to feel that this world is a good place through the faces he begins to recognize. These faces need not be those of his natural father and mother. He only knows that they are the ones who comfort him and brush away his fears and tears and in whom he places his love and trust. To destroy this trust would result in a feeling of rejection just at a time when his outlook on life is being formed. He may reason that he is being taken away from people whom he dearly loves because they do not want him any longer. Children of broken homes need love above everything else, and this was supplied by the grandmother and plaintiffs. When plaintiffs declined the payments tendered for caring for the child, *prima facie* evidence of the needed love was established and it indicated a greater value of love than of material gains.

It is the instinct of a child to attach itself and cling to those who perform toward it the parental office, and they become endeared to it by ministering to its dependence. A parent, by transplanting his offspring into another family and surrendering all care of it for so long a time that its interest and affection all attach to the adopted home, may thereby seriously impair his right to have back its custody by judicial decree. In a controversy over its possession, its welfare will be the paramount consideration in controlling the discretion of the court. The strict right of the parent will be passed by if a judgment in observance of such right would substitute a worse for a better custodian. *Lavigne v. Family and Children's Society, etc.,* above, 11 *N. J.,* at *page 479* (1953).

The adoptive child has grown up under circumstances whereby his habits, taste, deportment and affections have naturally become conformed to plaintiffs, so that a disruption of the relations thus established must seriously endanger his interests.

The child's age, capacity to form a rational judgment and his mental development compel me to give credence to his wishes, desires and choice, especially when expressed under oath in open court and during direct and cross-examination.

*Gardner v. Hall,* 132 *N. J. Eq.* 64 (*Ch.* 1942), affirmed 133 *N. J. Eq.* 287 (*E. & A.* 1943); *Callen v. Gill,* 7 *N. J.* 312 (1951).

██ This court in dealing with adoption has broad discretion, being aware at all times that the best interests of the child is of paramount importance. There may be occasions when it is desirable to change the surname of a child, as when the child's father fails to support, abandons the child, and is indifferent to its welfare and best interests. Considering all the factors in the instant case, it is my opinion that the best interests of the child would be promoted by permitting the change of name. It would be strange indeed to permit the adoption and not permit the child to take the surname of the adopting parents, especially since the usual effect of a judgment of adoption is to transfer from the natural parents to the adoptive parents the custody of the child's person, the duty of obedience owing by the child, and all other legal consequences and incidents of the natural relation, in the same manner as if the child had been born of such adopting parents in lawful wedlock.

██ It would be difficult indeed to find a couple more suitable in every way to become parents of the child.

That the best interests of the child would be promoted by the adoption and changing of his name is too plain for doubt.

There will be a judgment in favor of plaintiffs.