IN THE MATTER OF THE ADOPTION OF "E", A CHILD, BY
JOHN P. BURKE AND CYNTHIA D. BURKE, PLAIN-
TIFFS-APPELLANTS.

Argued May 11, 1971—Decided July 1, 1971.

38

*Mr. Albert G. Besser* and *Mr. Leo Pfeffer,* of the New York Bar, argued the cause for plaintiffs-appellants (*Messrs. Hannoch, Weisman, Stern & Besser,* attorneys; *Mr. Leo Pfeffer,* of the New York Bar, *Mr. Albert G. Besser* and *Mr. Dean A. Gaver* on the brief).

*Mr. Edward Terner* argued the cause for intervenor, Children's Aid and Adoption Society of New Jersey.

*Mr. Mark F. Hughes, Jr.,* argued the cause as court-appointed *amicus curiae.*

*Mrs. Joan W. Murphy,* Deputy Attorney General, argued the cause *amicus curiae* for New Jersey Bureau of Children's Services (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Miss Joan W. Murphy,* Deputy Attorney General, on the brief).

*Mr. Arnold Jay Gold* argued the cause *amicus curiae* for Council on Adoptable Children (*Mr. Barry G. Radick* on the brief).

*Mr. George A. Breur* argued the cause *amicus curiae* for New Jersey Council of Churches (*Messrs. Breur and Breur,* attorneys; *Mr. G. Thomas Breur* and *Mr. George A. Breur* on the brief).

*Mr. Charles B. Blackmar,* of the Missouri Bar, submitted a brief *amicus curiae* for Department of Church in Society, Division of Homeland Ministries of the Christian Church (Disciples of Christ) in the United States and Canada, and Division of Human Relations, Board of Christian Social Concerns, United Methodist Church.

The opinion of the Court was delivered by

PROCTOR, J. The county court denied plaintiffs' application for a final decree of adoption. The court held that plaintiffs' lack of belief in a Supreme Being rendered them unfit to be adoptive parents. The plaintiffs appealed to the Appellate Division, and prior to argument there, we certified the case on our own motion. We reverse.

On June 27, 1969, the plaintiffs, John and Cynthia Burke, received custody of the baby girl "E" from the Children's Aid and Adoption Society of New Jersey (Society).[1] On May 23, 1970, the Burkes, having received the consent of the Society, filed an application for adoption with the county court. The Society filed a report with the court recommending that the application be granted.

On August 25, 1970, a hearing was held and the Society was permitted to intervene. On November 2, 1970, the court denied the plaintiffs' application and ordered the return of the child to the Society. 112 *N. J. Super.* 326. Final judgment was entered on November 24, 1970, but was stayed to give the parties an opportunity to appeal.

Both the Burkes and the Society filed appeals from the judgment denying the adoption. Mark F. Hughes, Esq., was appointed by the Appellate Division on its own motion as *amicus curiae* "for the purpose of reviewing the law on both sides of the controversy" on appeal. Subsequently, the New Jersey Bureau of Children's Services, represented by the Attorney General, the Council on Adoptable Children, the New Jersey Council of Churches, the Department of Church in Society, Division of Homeland Ministries of the Christian Church (Disciples of Christ) in the United States and Canada, and Division of Human Relations, Board of Christian Social Concerns, United Methodist Church, all requested and were granted leave to file briefs *amici curiae.*

The facts are undisputed. Cynthia Burke, holder of a Ph.D. in Psychology, is a past Associate Professor at Seton

---

[1]Children's Aid and Adoption Society of New Jersey is an agency licensed and approved by the State. See *N. J. S. A.* 9:3–18 *et seq.*

Hall University. Her husband, John, holder of a Master's Degree in Speech Pathology, is currently working toward his Doctorate at Southern Illinois University. In 1965, the Burkes applied to the New Jersey Bureau of Children's Services[2] for assistance in the adoption of a child. They were informed that, pursuant to a department regulation, they would be required to demonstrate some church affiliation before they could be considered suitable applicants. Since they could not demonstrate such an affiliation, they were denied the opportunity to adopt a child, and they instituted a suit for declaratory judgment seeking resolution of the question whether such "a religious qualification" might properly be required as a prerequisite to an adoption. The suit was dismissed by stipulation, however, when the Bureau of Children's Services revised its regulations which now provide in pertinent part:

Opportunity for religious or spiritual and ethical development of the child should receive full consideration in the selection of adoptive homes. Lack of religious affiliation or of a religious faith, however, should not be a bar to consideration of any applicants for adoption.

In July of 1967, after the regulations had been amended, the Society placed a baby boy (David) with the Burkes. With the recommendation of the Society, the county court granted final adoption on September 28, 1968. David has been living with the Burkes ever since and there is no dispute that he has been well cared for.

On June 27, 1969, the Society placed a three week old baby girl, "E", with the Burkes and she has been with them continuously since that date. On May 23, 1970, plaintiffs filed a complaint seeking adoption of the child. After con-

---

[2]The New Jersey Bureau of Children's Services is both a state adoption agency within the statutory scheme, and the state agency which sets the standards which other adoption agencies in New Jersey must meet to obtain State approval. Accordingly, the Bureau's regulations were applicable to the Society.

ducting an investigation, the Society compiled and filed a report recommending the adoption. The report noted that both Cynthia and John Burke were in excellent health, intelligent, well educated, attentive to their children, and able to provide a physically suitable home. The report also noted that "* * * the Burkes' attitude toward the children is one that is healthy, and one that is full of warmth and love * * *. Mr. and Mrs. Burke have no church affiliation; however the agency has found them to be people of high moral and ethical standards."

At the hearing, the trial judge focused on the area of religion. He directed almost all of his questions to the plaintiffs' lack of church affiliation and their lack of belief in the existence of a Supreme Being. John Burke testified that he had had formal religious training as a Catholic and Cynthia testifed that she had been raised as a Protestant. Both said they were now unaffiliated with any church and did not believe in a Supreme Being. Both articulated their humanistic views of morality and ethics, and their views of the type of ethical training they thought necessary to proper child rearing. The following colloquies with John Burke are illustrative:

THE COURT: Let's see now, an atheist doesn't believe in God at all and an agnostic does what? Can you tell me what you are? Are you an agnostic or an atheist, Mr. Burke?

MR. BURKE: Labels such as these have connotations that are unpalatable to some people. I wouldn't call myself an agnostic or an atheist.

THE COURT: Well, tell me what you are.

MR. BURKE: I am a humanist, I suppose. I believe in people. I believe in the goodness of morality in that what we need to learn in life is being good to one another and that the perception, the true perception of the Juda-Christian way of life are what make us good and this is the morality that obviously I haven't been able nor did I desire to throw off the teaching of my childhood.

\* \* \* \* \* \* \* \*

THE COURT: * * * [B]asically you have a good moral life and you believe in a code of morals, sir.

MR. BURKE: Yes, but I think that this code of morals while we have a tradition that brings it down to us the perception of the teach-

ings of Jesus Christ. For instance, not the christians of christianity, but the teachings of Jesus Christ, love thy neighbor. We have those but we have something better, we have an intellect and we have examples from the people who are alive today, my grandfather, for example, my own parents, which leads you to be able to interpret a moral way of life that is your own, that is your own morality and it isn't exactly making up your morals as you go along, it isn't that at all.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

MR. BURKE: I do not believe in the existence of a Supreme Being.

THE COURT: I am a little perturbed \* \* \* the man is outspoken. He could have lied about it and the fact that he didn't lie about it is so much in his favor.

Cynthia Burke, who said her views were the same as her husband's, responded similarly to inquiries by the court:

THE COURT: Well, tell me your views about a Supreme Being.

MRS. BURKE: It would be very difficult for me to give you a description of what I believe a Supreme Being to be. I believe in the power of life. I am very much in awe of the creating of power of life. But, I do not believe in a Supreme Being who is in any way personified.

THE COURT: All right. You don't believe in religion as such, do you?

MRS. BURKE: I do not believe that any one religion is anymore preferable to any other.

THE COURT: Do you believe in any religion?

MRS. BURKE: I do not subscribe to any religion, no. I am not a practicing member.

THE COURT: What was that?

MRS. BURKE: I am not a practicing member of any religion.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

THE COURT: Mrs. Burke, do you have any definite plans as far as raising these children in reference to a particular religious training or religious training per se?

MRS. BURKE: Well, religious training involves, as far as I am concerned, a great many things. It involves standards of morality or a way of life which I feel involves honesty, regards of others, responsibility for one's own faith. I have already begun to teach my child [David] these things, both by teaching him the things that I think a three-year-old boy is capable of learning and I expect to teach him these things by example. As far as philosophy and the more abstract ideas involved in religion and philosophy, I suspect that my children will end up knowing more about Christianity than the average child who goes to Sunday School.

John Burke's testimony regarding his views led the judge to comment, "I have heard some Catholics who were unable to express the Christian view as well as you expressed it." Nevertheless, the court indicated that church affiliation was of critical importance:

THE COURT: Maybe I am old-fashioned, Mr. Burke, maybe I am old-fashioned. If you are Jewish, you are a good Jew. If you be a Protestant, you be a good Protestant. If you are Catholic, you be a good Catholic. It doesn't mean that people are good or that people are as good as you are.

In his written opinion, the trial judge recognized that a court should be loathe to intervene in matters of religion. 112 *N. J. Super.* at 329. Nevertheless, reasoning that the "child should have the freedom to worship as she sees fit and not be influenced by parents or exposed to the views of prospective parents who do not believe in a Supreme Being," he held that the best interests of the child "E" would not be served by granting the application. *Id.* at 331. In effect, he held that the plaintiffs were unfit to assume the responsibility of adoptive parents. Accordingly, he denied the adoption and ordered that the child "E" be returned to the Society.

The trial court's decision rested solely on the grounds that plaintiffs, through their own testimony, did not believe in a Supreme Being or belong to a church of a recognized religion. There is nothing in the opinion to indicate that the Burkes were in any other way unfit or that E's "best interests" would be impaired by some other factor. In fact, the agency found them to be morally fit, and its report contained abundant evidence supporting this finding. Thus, the single issue before us is the propriety, under state and federal law, of the denial of an adoption solely on the basis of an absence of religious affiliation and a lack of belief in a Supreme Being.

No one appearing before this Court argues in favor of the trial court's determination. Attorneys representing numerous religious groups and adoption agencies and organiza-

tions have submitted briefs and appeared before us. They unanimously urge us to reverse the trial court and to make it clear that, in the future, our courts may not deny persons the right to adopt a child solely because of their religious beliefs or non-beliefs. Only the court appointed amicus curiae takes a variant position. He urges that the adoption in this case should be permitted because the child has formed important ties with the Burkes and separating her from them at this point would be psychologically damaging. Although he suggests that the trial court should be reversed for this reason, he urges us to make a prospective ruling than an agency may require membership in an established religion as a prerequisite to adoption.

For the reasons to follow, we believe the trial court erred in denying the adoption. Moreover, we cannot accept the suggestion of the court appointed amicus curiae that adopttion agencies should be free to refuse to place children with non-believers who are otherwise worthy. We believe that the trial court's decision and the suggestion of the court appointed amicus curiae both run counter to state and federal law.

*N. J. S. A.* 9:3–17 *et seq.* set forth the procedures and guides to be followed in adoption proceedings. *N. J. S. A.* 9:3–17(a) provides in part that it is the public policy of New Jersey to protect the child "from adoption by persons unfit for such responsibility." It is well established by statute and case law that the paramount concern of the court in awarding custody of a child is the promotion of the best interests and welfare of the child. *N. J. S. A.* 9:3–27(c); *Fantony v. Fantony,* 21 *N. J.* 525, 536 (1956); *Lavigne v. Family and Children's Soc. of Elizabeth,* 11 *N. J.* 473, 479 (1953); *In re N.,* 96 *N. J. Super.* 415, 425 (App. Div. 1967); *In re Adoption by B,* 63 *N. J. Super.* 98, 104 (App. Div. 1960); *Salmon v. Salmon,* 88 *N. J. Super.* 291, 306 (App. Div. 1965); *Grove v. Grove,* 21 *N. J. Super.* 447, 454 (App. Div. 1952); *Stawicky v. Stawicky,* 12 *N. J. Super.* 72, 77 (App. Div. 1951); *Seitz v. Seitz,* 6 *N. J.*

*Super.* 65, 66 (App. Div. 1949); *In re Jacques,* 48 *N. J. Super.* 523, 533 (Ch. Div. 1958). See generally Note, "Adoption in New Jersey—An Analysis of its Legal Effects and Consequences," 1 *Rutgers L. Rev.* 250, 256 (1947); 11 *N. J. Practice (Herr, Marriage, Divorce and Separation)* § 822, pp. 115–116 (3d Ed. 1963). Accordingly, if from the report and evidence presented by an approved agency, the court is "satisfied that the best interests of the child would be promoted by the adoption, the court shall enter a judgment of adoption." *N. J. S. A.* 9:3–27C.

■ The "best interests of the child" standard is flexible and leaves a great deal of discretion to the trial judge. However, the discretion is not without limits, and a reviewing court must be satisfied that on the record, giving due regard to the trial court's opportunity to observe the applicants and their witnesses, the discretion has been reasonably exercised. In the present case, the question is whether the trial court misused its discretion in denying an adoption solely because the applicants did not believe in a Supreme Being and were not affiliated with a church.

There are no prior reported decisions in this state holding that an adoption may be denied solely because the prospective adoptive parents were nonbelievers. The unreported case of *Eaton v. Eaton* (Ch. Jan. 27, 1936), which is cited in several of the briefs, is not apposite. That case involved a suit for divorce and custody of two minor children of the marriage. In awarding custody of the children to the father, the court took the mother's atheistic beliefs into account, but noted that in addition to her "renunciation of her belief in the existence of a Deity," the mother "also entertains notions which are contrary to accepted good morals." It is clear from the opinion that the mother's atheistic views were not the sole factor relied upon by the trial court, and in any event, in its per curiam affirmance, the Court of Errors and Appeals held that "the proofs, *apart from the many irrelevant beliefs of the wife,* support the conclusion

that the welfare of the children is best served by the award of their custody to the father." (emphasis added) *Eaton v. Eaton,* 122 *N. J. Eq.* 142, 143 (1937).

Although there are no decisions in this state which are directly on point, the cases demonstrate that generally our courts have been most reluctant to intervene in religious matters. See *Donahue v. Donahue,* 142 *N. J. Eq.* 701, 704 (E. & A. 1948) where Judge (now Justice) Schettino noted that "Intervention in matters of religion is a perilous adventure upon which the judiciary should be loathe to embark," and *Scanlon v. Scanlon,* 29 *N. J. Super.* 317, 325–326 (App. Div. 1954). Ordinarily courts will not intervene in the religious training and education of the child. See *Donahue v. Donahue, supra; T. v. H.,* 102 *N. J. Super.* 38, 40 (Ch. Div. 1968), *aff'd on other grounds* 110 *N. J. Super.* 8 (App. Div. 1969) ; *Boerger v. Boerger,* 26 *N. J. Super.* 90, 95 (Ch. Div. 1953).

On the other hand, religion has in some circumstances been one of the factors considered in determining the best interests of the child in both custody disputes and adoption proceedings. See *T. v. H., supra.; In re DeBois,* 7 *N. J. Misc.* 1029, 1033 (Ch. 1929) ; *In Matter of Turner,* 19 *N. J. Eq.* 433, 435 (Prerog. 1868) ; *Note,* "Survey of New Jersey Adoption Law," 16 Rutgers L. Rev. 379, 392–93 (1962) ; 11 *N. J. Practice, supra* at § 832, p. 131. In our efforts to protect the best interests of the child, we may afford religion special significance in certain cases, as, for example, where the natural parents object to the religion of the adoptive parents, see Note, "Religion as a Factor in Adoption, Guardianship and Custody," 54 *Colum. L. Rev.* 376, 393 (1954), *cf. N. J. S. A.* 9 :3–17 ; where the prior religious training of the child cannot be pursued because of the environment, *T. v. H., supra* (Jewish children raised in rural Idaho where there were no available religious facilities and no other persons of the same faith) ; or where a child has had some religious training and a court finds that the granting of custody to persons of a different religious persuasion

would cause emotional difficulties for the child. See *Boerger v. Boerger, supra.*[3] And, of course, we have not hestitated to intervene to protect a child where the religious beliefs of the parents threaten the physical well being of the child. *State v. Perricone,* 37 *N. J.* 463 (1962), *cert. denied,* 371 *U. S.* 890, 83 *S. Ct.* 189, 9 *L. Ed.* 2d 124 (1962) (blood transfusion to child of Jehovah's Witness). None of these factors operate against the adoption in this case.

It is implicit in our decisions as well as those of other states that religion may be viewed as a relevant factor in determining custody or adoption but, without other factual support, the religious factor is not controlling. See *Annotation,* "Religion as a Factor in Adoption Proceedings," 23 *A. L. R.* 2d 701, 702; *Annotation,* "Religion as a Factor in Awarding Custody of Child," 66 *A. L. R.* 2d 1410, 1412; Comment, "The Religious Factor in New York Adoption Proceedings," 18 *Syracuse L. Rev.* 825, 827 (1967); "Measuring the Child's Best Interests — A Study of Incomplete Considerations," 44 *Denver L. J.* 132 (1967); "Adoption — The Welfare and Best Interest of the Child," 5 *Willamette L. J.* 93, 95 (1968); List, "A Child and a Wall: A Study of 'Religious Protection' Laws," 13 *Buffalo L. Rev.* 9, 16 (1963); 2 *Am. Jur. 2d, Adoption,* § 63, pp. 911–912. The general rule is summarized in 2 *Am. Jur. 2d, supra,* as follows:

Having regard for the spiritual welfare of the child, the court before whom adoption proceedings are pending may consider the interest displayed in the religious development of the child either by the party

---

[3]Unlike the statutory schemes of some states, the New Jersey adoption statutes do not provide a legal presumption that the religion of a child placed for adoption remains that of its natural parents; nor do they mandate that the religion of the child's natural parents be the same as that of the adoptive parents whenever "practicable." See Ramsey, "Legal Imputation of Religion to an Infant in Adoption Proceedings," 34 *N. Y. U. L. Rev.* 649 (1959). The only indication of religious preference is in *N. J. S. A.* 9:3–23A(4)(b) which provides that an agency should be appointed "with due regard for the religious background of the child."

seeking adoption or by the party opposing it. A difference in race or religion may have relevance in adoption proceedings but that factor alone is not decisive in determining the child's welfare and does not permit the court to ignore other relevant considerations.

See also *In re Adoption of a Minor*, 97 U. S. App. D. C. 99, 228 *F. 2d* 446, 448 (D. C. Cir. 1955). The regulations adopted by the Bureau, which we have quoted above, comport with this general rule and with the guidelines promulgated by the Child Welfare League of America, a national organization comprised of 350 child service agencies. See *Standards For Adoption Service* (Revised CWLA, Inc. 1968). We regard the few cases cited by the parties on the significance of nonbelief in religion by prospective adoptive parents as inapposite or unpersuasive. *Compare In re Korte*, 78 *Misc.* 276, 139 *N. Y. S.* 444 (Cty. Ct. 1912) and *Shelley v. Westbrooke, Jac.* 226, 37 *Eng. Rep.* 850 (1821) (where a court deprived the poet Shelley of the custody of his own children because of his atheism) *with In re Clements*, 12 *Mo. App.* 592 (1882), *aff'd* 78 *Mo.* 352 (1883) (rights of adopting parent not affected by his want of religious belief).

 By basing his decision *solely* on the absence of the Burkes' belief in a Supreme Being and their lack of church affiliation, the trial court relied on a factor which cannot alone be determinative of the "best interests" of the child "E". We do not mean to suggest that a trial court may not probe into the religious background and convictions of prospective adopting parents in the same way as it and the investigating agencies may probe into all aspects of their lives and activities in order to determine fitness. Religion and morality are inextricably interwoven in the lives of most people in this country, and a high moral character of prospective adopting parents is an essential consideration in adoption proceedings. Sincere belief in and adherence to the tenets of a religion may be indicative of moral fitness to adopt in a particular case. Of course, a trial court may not stop the inquiry into moral fitness merely upon assurance that the applicants believe in a Supreme Being and attend

church regularly. Such belief may well be inconclusive of the question. Where the applicants do not profess a religion or a belief in a Supreme Being, the court may not stop there and deny an adoption. The question is still whether they are morally fit to adopt and, to answer that question, the court must probe their moral character. The Chief Justice, in his concurring opinion, maintains that in evaluating prospective adoptive parents, a court or an agency can consider only their *conduct* and that neither a court nor an agency may ask questions which bear merely upon beliefs or ethics. This ignores the fact that much of our conduct is determined by our beliefs and ethics. If we were to bar courts and agencies from asking questions in these areas we would hamstring them in their efforts to protect the best interests of the child.

On the other hand, we do not believe that any reasonable man no matter how devout in his own beliefs, would contend that morality lies in the exclusive province of one or of all religions or of religiosity in general. The present case is proof of this point. No one, including the trial judge, has ever questioned the moral character of the Burkes. Indeed, the Society found as fact that they were "people of high moral and ethical standards." At the hearing the trial judge himself recognized that morality was not necessarily equatable with religion, and that persons who profess adherence to an established religion may not be "as good" as the Burkes. Indeed, in staying his judgment pending appeal the trial judge noted that the children (David and "E") are in good hands.

Summarizing, while religion when coupled with other considerations may be a factor to be weighed by the court in determining the advisability of granting an adoption of a child, that factor barring special circumstances such as those referred to above, is not and cannot be controlling. Since the trial court denied the adoption solely because of the Burkes' lack of a religious belief, he misused his discretion and erred as a matter of law.

██ The lower court's decision is also defective in that it runs afoul of the First Amendment of the United States Constitution. Ordinarily, we would not consider a constitutional question if it were possible to rest our decision on narrower grounds. *State v. Salerno,* 27 *N. J.* 289, 296 (1958). However, in the present case, the lower court saw no constitutional impediments to its decision, and the court appointed *amicus curiae* urges us to subscribe to that view. He asks us to rule prospectively that agencies may constitutionally promulgate rules requiring of applicants for adoption membership in an established religion "if there is an abundant supply of adopting parents." Although it should be clear from what we have said above that we do not believe such a rule would comport with our case law or our statutory scheme, we believe that, in any event, the adoption of such a rule is barred by the First Amendment and the trial court erred in holding that it was not.

██ The First Amendment provides in pertinent part:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. * * *

This freedom of religion provision is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 *U. S.* 296, 60 *S. Ct.* 900, 84 *L. Ed.* 1213 (1940). It applies to the judiciary as well as the executive and legislative branches of the government. See *Shelley v. Kraemer,* 334 *U. S.* 1, 68 *S. Ct.* 836, 92 *L. Ed.* 1161 (1948). The provision consists of two separate but related clauses, the Establishment Clause and the Free Exercise Clause. The Establishment Clause bars a state from placing its official support behind a religious belief, while the Free Exercise Clause bars a state from interfering with the practice of religion by its citizens. *Cantwell v. Connecticut, supra,* 310 *U. S.* at 303, 60 *S. Ct.* at 903, 84 *L. Ed.* at 1218.

██ The United States Supreme Court has consistently held that government must maintain a posture of "wholesome

neutrality" on the question of religion. *E. g., School District of Abington Twp. v. Schempp,* 374 *U. S.* 203, 83 *S. Ct.* 1560, 10 *L. Ed. 2d* 844 (1963); *Torcaso v. Watkins,* 367 *U. S.* 488, 81 *S. Ct.* 1680, 6 *L. Ed. 2d* 982 (1961); *McGowan v. Maryland,* 366 *U. S.* 420, 81 *S. Ct.* 1101, 6 *L. Ed. 2d* 393 (1961); *McCollum v. Board of Education,* 333 *U. S.* 203, 210, 68 *S. Ct.* 461, 464, 92 *L. Ed.* 649, 658 (1948). The First Amendment not only requires the state to be neutral between various religions, but between religion and non-religion as well: "That Amendment requires the state to be neutral in its relations with groups of religious believers and non-believers. * * *" *Everson v. Board of Education,* 330 *U. S.* 1, 18, 67 *S. Ct.* 504, 513, 91 *L. Ed.* 711, 724–725 (1947). See also *Walz v. Tax Commission of the City of New York,* 397 *U. S.* 664, 695, 90 *S. Ct.* 1409, 1424, 25 *L. Ed. 2d* 697, 716 (1970) (Justice Harlan concurring).

In *Torcaso v. Watkins, supra,* the Supreme Court considered a question somewhat analogous to that in the present case. It held that a state could not disqualify atheists from serving as notaries public. The Court stated that neither state nor federal governments can constitutionally compel a person " '[T]o profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." 367 *U. S.* at 495, 81 *S. Ct.* at 1683, 6 *L. Ed. 2d* at 987.

The trial court held that *Torcaso* and the other First Amendment decisions are inapplicable to the present case and, for different reasons, the court appointed amicus curiae agrees with that holding.

Turning to the trial court's decision first, that court reasoned that the Burkes' First Amendment rights were not violated since adoption is a privilege rather than a right. 112 *N. J. Super.* at 330. We cannot accept this distinction. Whatever validity the right — privilege dichotomy has (see

Van Alstyne, "The Demise of the Right — Privilege Distinction in Constitutional Law," 81 *Harv. L. Rev.* 1439 (1968), it can have little meaning in First Amendment cases. See *Sherbert v. Verner*, 374 *U. S.* 398, 404, 83 *S. Ct.* 1790, 1794, 10 *L. Ed. 2d* 965, 971 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.") ; *Torcaso v. Watkins, supra; Speiser v. Randall,* 357 *U. S.* 513, 78 *S. Ct.* 1332, 2 *L. Ed. 2d* 1460 (1958). Whatever the opportunity to adopt is labeled, a court cannot disqualify someone from adopting solely on religious grounds without violating that person's rights to free exercise of his religious beliefs. Certainly, the opportunity to hold the office of notary public as in *Torcaso* is no more valuable than the opportunity to adopt.

The trial court distinguished *Torcaso* on another ground. It reasoned that "Torcaso was of age to make his own decision as to his belief or nonbelief in God," whereas "[i]n the present case E is of tender years" and her decision "to form a belief or nonbelief in a Supreme Being must await the time when [she] has the maturity, understanding and independent volition to do so * * *. The child should have the freedom to worship as she sees fit and not be influenced by parents or exposed to the views of prospective parents who do not believe in a Supreme Being." 112 *N. J. Super.* at 331.

The trial court's reasoning does not confront the fundamental constitutional problem. The issue is not whether an individual has a right to choose religion or nonreligion, but whether the government has the power to impose religion or to place a burden on one's beliefs regarding religion. Burdening the opportunity to adopt with religious requirements does both and if, as we believe, the government lacks such a power, religious requirements violate the Establishment Clause and the Free Exercise Clause of the First Amendment. The courts are an arm of the state and, as such, they are required to maintain a neutral posture on

the issue of belief and non-belief. We, as judges, regardless of our own personal beliefs and religious affiliations, cannot take the position that children may be placed only in the homes of believers until they are able to choose for themselves which course to pursue. Under the First Amendment we are incompetent to do so. Should we invade the province of religion in this instance, the religious beliefs of every citizen would be imperiled. We cannot forget that many of our forebears fled to this country to escape religious persecution for professing beliefs which were unpopular in their homeland. It was for this very reason that the Amendment was adopted, and if it is to have any meaning, it must protect minority rights in this area.[4] If judges are to have the

---

[4]Whether the Burkes be given the label of atheists, agnostics, humanists, or something else is unimportant. "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson v. Jones*, 80 *U. S.* 679, 728, 13 Wall. 679, 728, 20 *L. Ed.* 666, 676 (1872). Nevertheless, it is worth noting that it is not at all clear the Burkes are not "religious." Certainly, the indicia of religion described by the trial judge — affiliation with some organized church and belief in a Supreme Being — do not fit all accepted religions. See *Torcaso v. Watkins*, 367 *U. S.* 488, 495, 81 *S. Ct.* 1680, 1693, 6 *L. Ed.* 2d 982, 987 (1961). *Cf. Watson v. Jones, supra.* Mr. Burke described himself as a humanist which is specifically mentioned as a "religion" by the Supreme Court in *Torcaso.* Other religions of this country cited by the Court as not teaching "what would generally be considered a belief in the existence of God" are Buddhism, Taoism and Ethical Culture. 367 *U. S.* at 495 n. 11, 81 *S. Ct.* at 1684, 6 *L. Ed.* 2d at 987 n. 11. In *United States v. Seeger*, 380 *U. S.* 163, 85 *S. Ct.* 850, 13 *L. Ed.* 2d 733 (1965) and *Welsh v. United States*, 398 *U. S.* 333, 90 *S. Ct.* 1792, 26 *L. Ed.* 2d 308 (1970), the Supreme Court held that qualification as a conscientious objector could not be made to turn upon affiliation or membership in any religious group but must also encompass beliefs which are entirely individualistic. Thus, the well settled principle that government cannot discriminate between religious sects (see *Zorach v. Clauson*, 343 *U. S.* 306, 314, 72 *S. Ct.* 679, 684, 96 *L. Ed.* 954, 962 (1952) ; *Tudor v. Board of Education of Rutherford*, 14 *N. J.* 31 (1953), *cert. denied Gideons International v. Tudor*, 348 *U. S.* 816, 75 *S. Ct.* 25, 99 *L. Ed.* 644 (1954) ), cannot be avoided merely by removing the title "religion" from a set of beliefs because the beliefs do not encompass the ex-

power to deny adoptions on the basis of the applicants' lack of religious beliefs, the door is opened to other judicial intrusions into this sensitive field. It is obvious that, in arriving at any decision, a court may not be influenced by its religious predilections. See Note, "Court Refuses Adoption For Disbelief in a Supreme Being — In re Adoption of E," 2 *Seton Hall L. Rev.* 460 (1971), where the author, in criticising the trial court's decision, comments that," * * * if the right established by the court is to be recognized, it is foreseeable that it portends the right to be raised in the 'right' religion."[5]

▮▮▮▮▮ It is true, as the court appointed *amicus curiae* points out, that government action which infringes on re-

---

istence of a Supreme Being or are otherwise unconventional. "If an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content * * * those beliefs certainly occupy in the life of that individual 'a place parallel to that filled by * * * God' in traditionally religious persons." *Welsh v. United States, supra*, 398 *U. S.* at 340, 90 *S. Ct.* at 1796, 26 *L. Ed.* 2d at 319.

---

[5] It may be doubted whether a decision intended to foster belief in a Supreme Being would achieve that goal. See *Isaac, Adopting a Child Today*, 11–13 (1965) where the author states:

"In applying to the majority of adoption agencies a couple will be considered only if they both belong to the same faith and only if they are practicing members of their church * * * The couples who are active members of their church, and who can readily produce their clergyman's reference, thus start out with a great advantage over couples not affiliated with any church.

"The solution for the disadvantaged couple will depend upon their attitudes and beliefs as well as upon the attitude of their local agency * * * The couple who is not affiliated with a church and does not want to become affiliated *or even wish to pretend* to be affiliated may have to abandon hope of adopting through an agency. "* * * Realistically speaking, if they are not served by a liberal agency, couples with no church affiliation have three choices: join a church; *pretend to belong to a church*, perhaps obtaining the reference of a sympathetic clergyman-friend; *or adopt privately* * * *."* (emphasis added)

The Burkes, of course, were completely forthright in explaining their humanistic beliefs.

ligious beliefs is not necessarily unconstitutional. As the Court stated in *McGowan v. Maryland, supra,* 366 *U. S.* at 442, 81 *S. Ct.* at 1113, 6 *L. Ed. 2d* at 408:

However, it is equally true that the "Establishment" Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions. In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands such regulation.

In *McGowan,* the Court upheld the "Sunday Closing" laws since it found they served a valid secular purpose. In the present case, no valid secular purpose exists. Since it is uncontradicted that the prospective parents are of high moral character, the only purpose in requiring religious affiliation and belief in a Supreme Being can be religious. *Amicus curiae* suggests that religiosity serves the secular purpose of reducing the likelihood of juvenile delinquency by an adopted child. But the studies cited by him are inconclusive and, if anything, seem to point in the opposite direction. Similarly, his assertion that divorce and the resulting trauma to children are more likely in non-religious families is not substantiated. In any event, adoptions should be dealt with in a highly individualistic manner rather than on the basis of speculative and sweeping generalizations; they should not be denied because the applicants belong to a class which statistically shows a greater propensity for some unfortunate trait. To deny an adoption, the court must find evidence of that trait or find some other damaging evidence in the individual applicants. Applicants for the adoption of children stand before the judge as individuals and must be judged on their own merits.

Finally, the court appointed *amicus curiae* suggests that the likelihood that a child of nonbelievers will be ostracized serves as a valid secular reason for denying adoptions to them. Even assuming that nonbelievers are shunned by some elements of the populace, most minority groups suffer or in the past have suffered the same penalty. Yet, absent special

circumstances, no one would contend that members of a minority group should be denied the opportunity to adopt a child on that basis.

One other point deserves mention. The concurring opinion finds our holding that religion may be a factor in adoption proceedings as objectionable on constitutional grounds as the trial court's holding that it may be the sole factor. That conclusion, of course, rests on the premise that the entire area of ethics and beliefs is irrelevant in adoption proceedings. If it is relevant, as we firmly believe it is, then questions concerning religion as it bears on ethics are not constitutionally forbidden because they serve a valid secular purpose. As stated above, such questions may be evidential of moral fitness to adopt in relation to how the applicants will conduct themselves as adopting parents.

In view of what we have said above, it is unnecessary for us to consider plaintiffs' further contentions that the trial court's decision denied both them and the child "E" equal protection and due process of law.

 The judgment of the trial court is reversed. Since the sole ground for denying the adoption was the Burkes' beliefs regarding religion and it is clear from the record that they are otherwise fit, we grant the adoption in the exercise of our original jurisdiction. See *R.* 2:10–5; *In re Adoption by B, supra,* 63 *N. J. Super.* at 104.

Judgment is entered in accordance with this opinion.

WEINTRAUB, C. J. (concurring). I concur in the result but cannot join in the opinion of the Court. Although the majority opinion concludes the trial court erred in refusing to order the adoption "solely" on the basis of plaintiffs' lack of belief in a Supreme Being, the opinion does not condemn the trial court's inquiry into the subject. Since satisfaction of a judge's curiosity could hardly warrant that inquiry, I must conclude the majority opinion finds the subject to be relevant and a litigant's views upon it to be capable of constituting a factor in a decision to deny a judgment of adoption. For-

tunately for us, the Burkes are not otherwise tainted and hence we are spared the task of deciding how many points should be charged against them because their articles of faith concerning a Supreme Being may deviate from our private views to a degree we severally cannot stand. I think none of this is the proper concern of a terrestrial judge.

We are not talking about honoring the express stipulation made by a consenting natural parent as to the religious faith of an adoptive parent. Nor are we concerned with the hypothetical case of a child whose prior religious training reached the point where a change of direction might inflict some psychological trauma. Rather the simple question is whether the State may inquire into an individual's religious, spiritual and ethical concepts in order to decide whether that individual is fit to raise a child. I think it is not the State's business to prowl among anyone's thoughts and to label him fit or unfit, in whole or in part, because his views are distasteful to someone in a placement agency or in the judiciary.

The majority opinion finds the State would violate the demand for neutrality in religious matters embedded in the First Amendment guarantee of freedom of religion if adoption were denied "solely" because of an applicant's religion or lack of it. With that, I agree, but I cannot understand how the constitutional violation is a whit less because the applicant's religion or lack of it plays some lesser role in the judge's decision. Whether the price of the heresy is the destruction of a man's good character or merely a blot upon it, it is equally true that the State stamps its approval upon some tenets and its disapproval upon others. This is precisely what the First Amendment forbids.

I can think of nothing more unmanageable than an inquiry into a man's religious, spiritual and ethical creed. There is no catalogue of tolerable beliefs. Nor would the nature of man permit one, for man is inherently intolerant as to matters unknowable, and the intensity of his intolerance is twin with the intensity of his views. I assume the majority would never deny adoption "solely" because of a belief in

that area, but if the belief may be considered as the majority say it may, then how much may be charged against an applicant who is a Jehovah's Witness and therefore opposed to blood tranfusions, or a Christian Scientist, who, as I understand his faith, would turn to medical aid only as a last resort? And since a man's religious, spiritual and ethical views may be more evident in his position on specific subjects than in his abstract statement of his faith, will it be all right to inquire of his attitude toward the war in Vietnam, or capital punishment, or divorce, or abortion, or perhaps even public welfare, or income taxation, or caveat emptor, in all of which some people find evidence of moral fiber or lack of it?

Nor is there anyone competent to pass judgment upon religious, spiritual and ethical matters. I do not know how a placement agency tests or equips its staff for this demanding task. I do know that neither when they were admitted to the bar nor when they were appointed to the bench, were judges asked to establish the acceptability of their own tenets or a capacity to appraise the tenets of others. As for me, I disclaim any expertise whatever. I have already interred too many of my eternal truths.

No matter how it is phrased or explained, an inquiry into religious, spiritual and ethical views can mean no more than this, that a man or a woman is unfit, or a bit unfit, to be a parent, natural or adoptive, if his or her thoughts exceed the tolerance of the mortal who happens to be the judge in a placement bureau or in the judiciary. I find such an inquiry to be as offensive as it is meddlesome and irrelevant to the true issue. Every incursion is sure to repeat the spectacle now before us. I think it strong evidence of good moral character that an applicant wants to rear a child, and that should be quite enough in the absence of positive conduct revealing unfitness for parenthood.

WEINTRAUB and JACOBS, JJ., concur in result.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*—None.